Filed 7/15/16

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>ADAM WADE DISA,<br><br>    Defendant and Appellant. | A137355/A139872<br><br>(Solano County<br>Super. Ct. No. VCR210260) |

Defendant Adam Wade Disa admitted to police that he killed his girlfriend by putting her in a choke hold, but denied he meant to kill her. A jury found him guilty of first degree murder (Pen. Code, § 187).

Defendant contends there was insufficient evidence of premeditation and deliberation, and the trial court erred in admitting evidence of defendant's prior act of domestic violence. We conclude the evidence of premeditation and deliberation—though far from compelling—was sufficient to sustain the first degree murder conviction. Absent error, we would affirm. However, we conclude that it was error to allow the jury to hear extensive evidence of defendant's past act of domestic violence, which involved planning, hours of waiting, and a bloody knife attack on sleeping victims. Given the relative weakness of the evidence of premeditation and deliberation in the current case, we conclude there is a reasonable probability the improper admission of such vivid and inflammatory evidence of defendant's past conduct affected the verdict. Accordingly, we reverse the first degree murder conviction. We need not reach defendant's remaining arguments.

1

## FACTUAL AND PROCEDURAL BACKGROUND

Defendant and the victim, Katie Gillihan, worked together at Rasputin Music and began dating in late 2009 or early 2010. In September 2010, defendant moved in with Gillihan in her apartment in Benicia.

Michelle Gonzales also worked at Rasputin and knew defendant and Gillihan. Shortly before 2:00 p.m. on Friday, February 11, 2011, Gonzales went to check on Gillihan because both defendant and Gillihan had missed two scheduled work shifts in a row. Gonzales found the front door of Gillihan's apartment unlocked and Gillihan in bed, "like she was just sleeping." Gonzales tried to wake her. Gillihan appeared very still and straight with the sheets pulled up to her chin. There was dried blood under her nose.

Gillihan's mother, Donna Gillihan (Donna), also arrived at Gillihan's apartment around this time. Gonzales told Donna she could not wake Gillihan up. Donna became very upset and instructed Gonzales to call 911.

Paramedics arrived at the apartment, and Gillihan was pronounced dead at 2:25 p.m. Her skin had cooled to the temperature of the room, and there were signs of marbling, lividity, and late-stage rigor mortis, indications that she had been dead for many hours.[1]

Defendant was arrested the same day Gillihan's body was discovered. In a videotaped interview with Detectives Rose and Rouse of the Benicia Police Department, he admitted he killed Gillihan using a choke hold.

Defendant was charged with murder (Pen. Code, § 187, subd. (a); count 1) and corporal injury on a cohabitant (Pen. Code, § 273.5, subd. (a); count 2). As to count 2, the district attorney alleged defendant personally inflicted great bodily injury under circumstances involving domestic violence. (Pen. Code, § 12022.7, subd. (e).) As to both counts, it was alleged defendant had suffered two prior strike convictions (Pen.

---

[1] A pathologist later conducted an autopsy on Gillihan and found no trauma or injury and no evidence of natural disease. Toxicology analysis showed no alcohol, prescribed medications, or illicit substances present.

Code, §§ 667, subds. (b)-(i), 1170.12, subds. (a)-(d)), which were also serious felony convictions (Pen. Code, § 667, subd. (a)).

*Defendant's Interview*

At trial, the prosecution played defendant's videotaped interview for the jury. In the interview, which lasted about two hours, defendant told the officers Gillihan was his girlfriend and they lived together, but he initially acted as though he was unaware of her death. He claimed he did not know where she was because he had not been home.

Defendant reported there were some trust issues in the relationship. He said, in the previous three weeks, Gillihan had spent her days off with a friend, Marty Procaccio.[2] Defendant suspected Gillihan was cheating on him with Procaccio, but she denied it. He mentioned an incident involving Procaccio that occurred three weeks earlier. Defendant came home and found Procaccio there. Defendant told Gillihan he needed to be informed if there was going to be a man in the house, and Gillihan said Procaccio was just a friend. Asked by the detectives how he felt about this, defendant responded, "I was seeing green. Jealous. Um, suspicious, I guess but."

Defendant said Gillihan was sleeping when he left their apartment Thursday morning, February 10, and he had been staying with his mother since then "to prevent tension" because Gillihan "wants space." Defendant texted Procaccio Thursday night and again that day. He asked Procaccio, who he knew lived in Santa Clara, to check on Gillihan in Benicia because Tuesday night she had been sick.[3]

---

[2] At trial, Procaccio testified he was "really close friends" with Gillihan, and they had been "off and on lovers." In his videotaped interview, defendant talked about Gillihan's friend "Marty" without providing a last name, but Procaccio's testimony established he was the "Marty" to whom defendant was referring.

[3] Procaccio confirmed he received messages from defendant stating that Gillihan was sick. By text message, defendant told Procaccio to check on her. Around noon on Friday, February 11, Procaccio asked defendant for Gillihan's mother's telephone number. Procaccio then left Donna a message and eventually spoke with her. He asked if she had heard from Gillihan in the past couple days and said he was on his way to check on her. Donna told Procaccio there was no need for him to drive up to Benicia, and she would check on Gillihan.

3

About 30 or 40 minutes into the interview, Detective Rouse noted that defendant had not asked why he was being questioned by the police and told him, "I think it's cause you know why you're here." At this point, defendant admitted he killed Gillihan. He said he went home Tuesday night, February 8, and Gillihan "was adamant about [defendant] leaving" the apartment, which left him "confused." She "was texting somebody that whole night," and "she was angry because [defendant] was there." Defendant did not leave the apartment, and instead took a shower and went to sleep.

Defendant described what happened early Wednesday morning, February 9, as follows: "I think it was probably around 5:30 in the morning that um, she did, woken me up. And um, she was telling me you need to get out. You need to leave. And um, I was like why do I need to leave? And she was like so I can take, you know, in her words, a fucking shower. And um, I was like, well I'm not going anywhere. And then that's when the insults started to happen. Like you're fucking retarded um, what is it? Um, you're fucking stupid. Um, what else? She was, it was just like it wasn't Katie. Like I'm not used to Katie talking to me like that. And I guess she swung at me or something. Oh, before that she said what she was gonna do is she was gonna give herself a black eye and she was gonna tell everybody I like, you know, to have done it. And I mean it was just like one thing after another. It was just like what's this coming from? And I guess she swung at me and I'm half asleep and after that it's, all I remember is um, I guess I had her in a choke hold and um. To be honest, man I thought she was sleeping because while I went to um, you know, she was laying there and then um, I went to work. I came back that same night and she, I guess she wasn't sleeping."

Defendant further stated that he and Gillihan had an argument Tuesday night and again Wednesday morning. She woke him up between 5:30 and 6:00 a.m. Wednesday by turning up the television and holding her phone to his face while "it flashe[d]" or was "buzzing." After Gillihan told him she would give herself a black eye and tell everybody he did it, defendant asked why she would do something like that. Defendant told the officers, "I don't really remember the explanation because after that, it's just—we had the—the incident." He recalled that Gillihan said something like " 'You sicken me.' "

4

Defendant continued, "I just remember seeing rings going towards my face.  And I must have blocked it.  And after I blocked it, that's when the choke hold came."  He held her in a choke hold "for about a minute or so.  Maybe a little bit longer."  She was trying to scratch his face, and he said, "I just held on until she—she—stopped trying to, you know, induce any pain towards me.  And then I let go."  Defendant said he felt Gillihan's body go limp, and then he kept her in the hold "[m]aybe 15 seconds" after she stopped moving.

Defendant described how he was feeling:  "I was angry prior to the incident when she was, you know, saying all these bad things.  That's what made me angry.  But afterwards, it was—I didn't really feel anything afterwards. . . . I remember looking at her and then I got the cigarettes. . . . I just felt a little relieved, I guess.  Just like everything's pretty much, you know, when the fight's over, you know, it's like I'm calming down, relaxing, I guess."  His "main emotion when she was throwing insults at [him] . . . was anger."  It was "still anger" when he had her in the choke hold, but defendant denied that he intended to kill her.  He told the officers he thought he could "knock her out" or "put her to sleep."  However, he knew keeping a person in a choke hold for more than a minute could eventually cause death.

Defendant called the hold he used on Gillihan a "figure four or something" and demonstrated the hold.  Detective Rose recognized the hold defendant demonstrated was a "carotid restraint hold."  Defendant had been studying kung fu for over a year, but he did not learn the hold in kung fu class.[4]  He stated, "Actually I learned this choke hold from a[n] ex of mine.  She put me in it."  He had "never really used it" himself, but when he was in it, "it was pretty bad."  Defendant reported that he and Gillihan had never had any physical confrontation before that day.

After he released her from the hold, defendant laid Gillihan down.  Then he went into another room, smoked a couple of cigarettes, and went to sleep.  Later Wednesday

---

[4] This was corroborated by defendant's kung fu teacher, who testified he did not teach any type of choke hold.  He knew what the carotid hold is, and never taught it to defendant.

morning, he got up, ate some jambalaya that was on the stove from the night before, and went to work without checking on her. After work, he went to kung fu class, and returned home around 9:00 p.m. According to defendant, he only then realized Gillihan was dead when he saw her lying in the same position he had left her. He did not call the police because he was "on probation,"[5] and he did not notify anyone else because, he thought, "it's over for me . . . ."

Thursday, February 10, defendant packed food and clothes in a bag and went to his sister's house. He stated, "And then uh, pretty much, you know, [I] came to terms with it's probably time to say goodbye to everybody." He took money from his bank account, which he said was "for my family."[6] However, he did not talk about the money with anyone, and he left no note.

Defendant said he then tried to commit suicide by putting rat poison in his soda, but it just made him vomit. He also went to a bridge and thought he would jump "to give [himself] a watery grave." He told the officers he had been feeling depressed for the previous three weeks about his relationship with Gillihan, and he told her that he was thinking of committing suicide.

### Other Prosecution Evidence

#### Jealousy

Gonzales testified about a party at a coworker's house, during which Gillihan sat and talked with a male guest. Defendant "came over a couple of times and looked very angry that she was having a conversation with him." Gonzales testified there was a "fuming quality" about the way defendant was watching them.

Procaccio recounted three instances of defendant acting jealous. First, in 2010, Gillihan was going to visit Procaccio at his house, and defendant sent him a message on Facebook telling him, "you better behave yourself, bro." Second, at a Halloween party at

---

[5] In fact, defendant was on parole, not probation.

[6] At defendant's sister's house in Vallejo in a room identified as defendant's bedroom, police found approximately $1,400 in cash, two bank withdrawal statements, defendant's California identification card, his ATM card, and his PIN.

6

Procaccio's house in 2010, defendant got drunk and "there was a lot of jealous, pointing and . . . staring and like evil looks that [defendant] would give to people who were talking to [Gillihan]." The third incident occurred on January 19, three weeks before defendant killed Gillihan. Procaccio was at Gillihan's apartment, and defendant arrived home early. Defendant and Gillihan went upstairs, and Procaccio could hear them arguing and heard his name mentioned a few times.

### Prior Domestic Violence

San Jose Police Officer Wendell Martin testified about defendant's prior violent conduct with an ex-girlfriend.[7] At 3:30 a.m. on April 22, 2004, Martin was dispatched to an apartment in San Jose. Christina Cepeda answered the door. In the living room, defendant was passed out on the floor with severe lacerations on two fingers of his right hand, and another man, Edward Estrella, was covered with blood. In the bedroom, Martin observed "a lot of blood"—blood was splattered on the walls, closet, rug, and bed.

Subsequently, defendant told Martin that he had been dating Cepeda since July 1999, and they had been living together over the prior year. Defendant had known Estrella since 7th grade. Cepeda broke up with defendant on February 16, 2004, and defendant believed it was because she was seeing Estrella behind his back. After they broke up, Cepeda and defendant continued to share their apartment by alternating weeks living there. At the time Martin was dispatched to the apartment, it was Cepeda's week to stay there. Defendant used his key to enter the apartment on April 21, 2004, while it was empty. Around 3:00 p.m., Cepeda and Estrella came home, and he hid in the closet for about half an hour until they left. Then he came out of the closet, but remained in the apartment and watched television. Around 9:00 p.m., defendant hid in the closet again. Cepeda and Estrella came home around 10:30 p.m. Defendant came out of the closet at

---

[7] The trial court ruled evidence of this incident was admissible pursuant to Evidence Code section 1109, subdivision (a)(1). Under this provision, when a defendant is charged with an offense involving domestic violence, evidence of other acts of domestic violence by the defendant is admissible for the purpose of showing a propensity to commit such crimes. (*People v. Brown* (2011) 192 Cal.App.4th 1222, 1232–1233; *People v. Hoover* (2000) 77 Cal.App.4th 1020, 1024.)

7

3:30 a.m. and tried to stab Estrella and Cepeda. He stated that he felt betrayed by both of them, and they broke his heart. After defendant stabbed Estrella a few times, the knife slipped, and defendant injured his own hand.

Defendant told Martin he bought the knife he used in the attack while he was still living with Cepeda. He took the knife with him when it was his turn to use the apartment, and had it with him when he hid in the closet. Defendant told Martin he had thought about doing something in the previous week, and he kept going back and forth. He wanted some sort of revenge. Martin asked defendant if he was trying to kill Cepeda and Estrella. Defendant said he did not know if he wanted to kill them, but he "was hoping someone would get hurt."

### *Carotid Restraint Hold*

The pathologist who conducted Gillihan's autopsy testified that, with the "carotid hold," which he also referred to as the "carotid sleeper hold," the person applying the hold places the crook of his arm at the front of the neck of the victim and squeezes his upper arm and forearm, pressing on the blood vessels of the neck, stopping the flow of blood to the brain. When applied correctly, the carotid hold causes unconsciousness very quickly and can render someone dead in a minute. Based on the autopsy and review of defendant's interview, the pathologist concluded the cause of Gillihan's death was "asphyxia due to manual strangulation with the carotid sleeper hold."

At police academy, Detective Rose received training on the carotid restraint hold in defensive tactics training. He was taught the average person in the hold loses consciousness within about 12 seconds, and the hold should never be applied for longer than 30 seconds.

### *Phone Records*

The last outgoing text message from Gillihan's phone was sent to Procaccio on Wednesday, February 9, at 5:16 a.m. Procaccio testified that he was texting with Gillihan from about 4:00 to 5:15 a.m. Wednesday morning. Gillihan's phone received no calls or texts from defendant after Tuesday, February 8.

### *Verdict and Sentence*

8

The jury found defendant guilty of first degree murder (count 1) and corporal injury on a cohabitant (count 2), and found true the special allegation that he inflicted great bodily injury under circumstances of domestic violence. In bifurcated proceedings, the trial court found defendant had two prior strike convictions.

Defendant was sentenced to state prison for 50 years to life based on a term of 25 years to life for count 1, doubled due to the prior strike conviction. For count 2, the court imposed the upper term of four years, plus a five-year enhancement for great bodily injury, and stayed the punishment pursuant to Penal Code section 654.

## DISCUSSION

### I.     *Sufficiency of Evidence of Premeditation and Deliberation*

Defendant contends the prosecution presented insufficient evidence of premeditation and deliberation to support the first degree murder verdict. We disagree.

" 'When a defendant challenges the sufficiency of the evidence, " '[t]he court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' " ' [Citation.] 'The standard of appellate review is the same in cases in which the People rely primarily on circumstantial evidence.' [Citation.] 'Although a jury must acquit if it finds the evidence susceptible of a reasonable interpretation favoring innocence, it is the jury rather than the reviewing court that weighs the evidence, resolves conflicting inferences and determines whether the People have established guilt beyond a reasonable doubt.' [Citation.] ' " 'If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment.' " ' " (*People v. Casares* (2016) 62 Cal.4th 808, 823–824.)

" 'A verdict of deliberate and premeditated first degree murder requires more than a showing of intent to kill. ([Pen. Code,] § 189 ["willful, deliberate and premeditated killing" as first degree murder].) "Deliberation" refers to careful weighing of

9

considerations in forming a course of action; "premeditation" means thought over in advance.  [Citations.]'  [Citation.]  ' " 'The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly. . . .' " ' " (*People v. Casares*, *supra*, 62 Cal.4th at p. 824.)  To prove a killing was " 'deliberate and premeditated,' " it is "not . . . necessary to prove the defendant maturely and meaningfully reflected upon the gravity of his or her act." (Pen. Code, § 189.)

In *People v. Anderson* (1968) 70 Cal.2d 15, 26-27 (*Anderson*), the California Supreme Court "identified three factors commonly present in cases of premeditated murder:  '(1) [F]acts about how and what defendant did *prior* to the actual killing which show that the defendant was engaged in activity directed toward, and explicable as intended to result in, the killing—what may be characterized as "planning" activity; (2) facts about the defendant's *prior* relationship and/or conduct with the victim from which the jury could reasonably infer a "motive" to kill the victim, which inference of motive, together with facts of type (1) or (3), would in turn support an inference that the killing was the result of "a pre-existing reflection" and "careful thought and weighing of considerations" rather than "mere unconsidered or rash impulse hastily executed" [citation]; (3) facts about the nature of the killing from which the jury could infer that the *manner* of killing was so particular and exacting that the defendant must have intentionally killed according to a "preconceived design" to take his victim's life in a particular way for a "reason" which the jury can reasonably infer from facts of type (1) or (2).' " (*People v. Koontz* (2002) 27 Cal.4th 1041, 1081.)

Our high court has cautioned that *Anderson* " 'did not refashion the elements of first degree murder or alter the substantive law of murder in any way.'  [Citation.]  In other words, the *Anderson* guidelines are descriptive, not normative.  'The *Anderson* factors, while helpful for purposes of review, are not a sine qua non to finding first degree premeditated murder, nor are they exclusive.' " (*People v. Koontz*, *supra*, 27 Cal.4th at p. 1081.)  Thus, the *Anderson* "factors need not be present in any particular combination to find substantial evidence of premeditation and deliberation.  [Citation.]  However,

10

'[w]hen the record discloses evidence in all three categories, the verdict generally will be sustained.' " (*People v. Stitely* (2005) 35 Cal.4th 514, 543.)

Viewed in the light most favorable to the judgment, the evidence showed Gillihan and defendant were dating and living together, but there were problems and trust issues in their relationship. On Tuesday night, February 8, 2011, Gillihan was not happy to see defendant and told him to leave the apartment, but he would not leave. Very early the next morning, Gillihan texted with Procaccio for over an hour. Defendant was jealous of Gillihan's relationship with Procaccio, and he suspected she was cheating on him with Procaccio. Around 5:30 that morning, defendant killed Gillihan by using a carotid restraint hold, which he referred to as a "choke hold" and which he knew was "pretty bad" from personal experience. Defendant recognized the hold he used could lead to death. He kept Gillihan in the carotid restraint hold for 15 seconds after her body went limp, and he laid her in the bed and covered her so that it appeared she was sleeping. After killing Gillihan, defendant smoked two cigarettes, went back to sleep for a few hours, and then went to work. There was no evidence of other physical injury to Gillihan, nor was there any evidence of injury to defendant. At no point did defendant call 911 or seek medical assistance for Gillihan.

While not overwhelming, these facts are sufficient to support a verdict of premeditated and deliberate first degree murder. "[P]lanning activity occurring over a short period of time is sufficient to find premeditation." (*People v. Sanchez* (1995) 12 Cal.4th 1, 34, disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.) Here, as the Attorney General argues, evidence of planning may be inferred from the fact defendant "deliberately continued to exert pressure on [Gillihan's] neck even after she went limp." A rational jury could find that defendant "rapidly and coldly formed the idea to kill" Gillihan after she stopped struggling and before he released her from the carotid restraint hold. (*People v. Brady* (2010) 50 Cal.4th 547, 563 ["premeditation and deliberation can occur in a brief period of time" and "lack of evidence of extensive planning does not negate a finding of premeditation"].)

11

As to motive, the evidence suggests defendant's motive for killing Gillihan was jealousy over Gillihan's relationship with Procaccio, anger because she was trying to kick him out his own house and was insulting him, and perhaps depression over the apparent ending of their relationship.

As to manner of killing, defendant used a carotid restraint hold, which can render a victim unconscious within a few seconds and dead in a minute. This manner of killing may be viewed as demonstrating "a calculated design to ensure death rather than an unconsidered explosion of violence."[8] (*People v. Horning* (2004) 34 Cal.4th 871, 902-03.)

In addition, the jury could reasonably consider defendant's conduct after the killing in relation to the manner of killing. (*People v. Perez* (1992) 2 Cal.4th 1117, 1128 (*Perez*).) In *Perez*, after stabbing the victim, the defendant did not immediately flee the scene and instead searched dressers and jewelry boxes and changed a bandage on his bloody hand. Our high court observed the defendant's conduct "would appear to be inconsistent with a state of mind that would have produced a rash, impulsive killing." (*Ibid.*) Likewise in this case, a reasonable jury could take into account defendant's calm behavior after the killing—smoking cigarettes, sleeping, eating leftovers, going to work—and find it inconsistent with a state of mind that would have produced a rash, impulsive killing.[9]

---

[8] In closing argument, the prosecutor explained how the manner defendant killed Gillihan could support a finding of deliberation: "[T]his is not a killing by shooting. This is not a killing by knifing. Both of those acts would sometimes be instantaneous. This is a murder by manual strangulation via the carotid hold which took over a minute. What that means is that this type of murder is close and personal. . . . So while he was holding her, he got to feel, he got to watch as she reached and tried to get out of that hold. . . . Then he also got to watch and feel as she struggled to breathe. This is not an instantaneous death. And finally he got to feel her go limp in his own arm and he continued to hold her. Was he thinking about what he was doing in that minute[?] Of course he was. One minute. That's a very long time, and I'm sure time slows down even more once she [loses] consciousness."

[9] Defendant counters that his actions after killing Gillihan indicated that he was in shock and did not understand what he had just done. However, defendant does not defeat

12

Defendant argues his "extremely limited knowledge of the hold he used" did not support a finding of premeditation and deliberation. But the fact that he incorrectly referred to the carotid restraint hold as a "figure four" does not negate an inference of premeditation and deliberation. Defendant asserts, "the notion that [he] would understand *the lethality* of a 15-second period of unconsciousness in the carotid hold was pure speculation." We disagree. By his own admission, defendant knew the hold he used was "pretty bad" and would eventually *cause death*. He also recognized that Gillihan "[p]robably" could not breathe while she was struggling in the hold, but he chose to keep her in a position where she probably could not breathe even after she stopped moving.

*People v. Rowland* (1982) 134 Cal.App.3d 1, relied on by defendant, is distinguishable. In *Rowland*, the defendant met the victim at a party and took her to his apartment, which he shared with his girlfriend. The victim's body was later discovered on a dirt road; she had died from strangulation with an electrical cord. (*Id*. at pp. 6-8.) The Court of Appeal found minimal evidence of planning and no evidence of motive, and concluded the manner of killing—ligature strangulation—failed to show premeditation and deliberation. (*Id*. at p. 9.) In contrast, here, there was ample evidence of motive, and, further, there was significant additional evidence regarding the manner of killing (defendant's own statement that he kept Gillihan in a choke hold for 15 seconds after she went limp) absent from *Rowland*.

Finally, defendant asserts the prosecutor acknowledged Gillihan provoked defendant by insulting him, threatening to give herself a black eye and say he did it, telling him to get out of the house, and swinging at him. He argues the "conceded" evidence of provocation could support, at most, a conviction of second degree murder. This argument lacks merit. First, the prosecutor did not concede that Gillihan's conduct

the sufficiency of the evidence merely by offering "competing inferences he wishes the jury had drawn." (*People v. Casares*, *supra*, 62 Cal.4th at p. 827; see *People v. Albillar* (2010) 51 Cal.4th 47, 60 ["If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding."].)

as described by defendant amounted to provocation. Second, defendant's argument suggests the jury was required to credit defendant's version of events in its entirety simply because the prosecutor assumed some of defendant's statements were true in making his closing argument. But the jury was free to disbelieve defendant's self-serving statements regarding what Gillihan did right before he killed her.[10] (*People v. Silva* (2001) 25 Cal.4th 345, 369 ["A rational trier of fact could disbelieve those portions of defendant's statements that were obviously self-serving . . ."].)

Again, we acknowledge the evidence of premeditation and deliberation in this case was not particularly strong, but "the relevant question on appeal is not whether we are convinced beyond a reasonable doubt, but whether *any* rational trier of fact could have been persuaded beyond a reasonable doubt that defendant premeditated the murder." (*Perez*, *supra*, 2 Cal.4th at p. 1127.) For the reasons we have discussed, we conclude the evidence in this case was sufficient to sustain a finding of premeditation and deliberation.

## II.    *Evidence of Prior Domestic Violence*

Defendant contends the trial court abused its discretion under Evidence Code section 352 by admitting evidence of his prior domestic violence under Evidence Code section 1109.[11] We conclude that some evidence of defendant's past conduct was admissible under section 1109, but the trial court abused its discretion in admitting evidence of facts showing defendant lay in wait for his victims. This error was then compounded by the ambiguity of the court's evidentiary ruling, which resulted in the prosecutor presenting extensive detail of defendant's past conduct. The admission of this evidence prejudiced defendant.

---

[10] We note that the trial court at the sentencing hearing stated, "I thought that [defendant's] explanation for how this happened was absolutely preposterous, . . . that he just woke up out of his sleep when he was being assaulted by this woman. This is—I didn't accept this for a minute, and the jury didn't accept this for a minute."

[11] Further statutory references are to the Evidence Code unless otherwise noted.

14

**A.    *Background***

Before trial, the prosecutor moved to admit evidence of defendant's past act of domestic violence from 2004.  He argued the evidence was admissible under section 1109, subdivision (a)(1), and was relevant to counter the defense that the killing was an accident.  Defense counsel argued the evidence should be excluded under section 352.

The trial court determined the past conduct and present charged conduct qualified as domestic violence under section 1109.  The court then thoughtfully addressed the section 352 issue:  "I think the real concern here is whether the Court should find pursuant to 352 that the . . . prejudicial effect outweighs any probative value, and I'm just not prepared to do that.  I have had an occasion to review the defendant's statement at this time where he claims that the current killing was either an accident or an incident that arose over an argument that he was having with the victim when she became disrespectful towards him.  Evidence of prior domestic violence and a propensity to do violence to a partner or former partner is extremely relevant.  This incident is really not that remote, and in fact, the defendant was still on parole for these offenses, the earlier offenses, when he committed this newer offense, and he talks about that in his interview.

"It appears to the Court that this is a case that's not really one in which there's going to be . . . any significant issue as to who committed the acts which led to the death of the victim but rather the circumstances under which these acts were committed and the intent of the defendant in committing the acts, and therefore, I think . . . this prior incident and evidence of this prior incident is extremely relevant.  So under [section] 352, I'll find that the probative value does outweigh any prejudicial effect this evidence may have.  I'm going to allow this to come in under [section] 1109."

Defense counsel then asked whether there was a way "to sanitize it so it isn't highly prejudicial."  He was concerned that the prior incident of domestic violence involved, first, lying in wait and, second, the use of weapon, which made the past conduct "radically different" from the current case.  The court indicated that it would consider the issue later.

15

After trial started and outside the presence of the jury, the parties revisited the issue.  The prosecutor stated he intended to present the responding police officer's testimony recounting what defendant told him "regarding why he did what he did and exactly what he did" in connection with the 2004 incident.  The prosecutor said the testimony would "address the defense of accident" and was relevant to intent and motive.  The trial court rejected any suggestion the evidence was admissible to show a common scheme or premeditation and deliberation in the present case, stating:  "I don't see the similarity in these offenses frankly.  One is a stabbing with a knife and lying in wait.  That's not at all what we have here."  The court further observed, "The acts are totally different."

The court reaffirmed its ruling that defendant's past conduct was admissible under section 1109.  The court then addressed the prosecutor as follows:  "I don't want you dwelling on the specifics of this earlier offense.  You're going to be allowed to bring this offense in simply to show, if it does, um, the defendant's propensity to commit domestic violence, so I'm going to allow this.  But as I'm going to warn you right now, [prosecutor], that I do not want you delving into each specific detail of this prior incident or emphasizing issues here that have nothing to do with this trial, such as the lying in wait.  I will let you bring in the fact that the defendant admitted that—if he did, that he came into the apartment when the victim was not home, waited until she and her new partner were asleep and came out and attacked them.  I'll let you admit that.  But we're not going into the details of this, and you're not to argue at any time that the lying in wait on this earlier occasion is somehow evidence of his guilt in this matter because it's not.  It's the . . . violence that he did that shows his propensity in this manner."

As described above, Officer Martin testified that defendant waited over 12 hours in his former girlfriend's apartment—including more than six hours spent hiding in a closet—and then attacked her and her new partner in the middle of the night with a knife he had brought to the apartment and kept with him while he waited in the closet.  The attack left Estrella covered in blood and the bedroom spattered with blood.  Defendant

16

told Martin he had thought about doing something in the previous week, he kept going back and forth, and he wanted some sort of revenge.

### B. *Applicable Legal Principles*

Character or propensity evidence, including evidence of a person's prior conduct, is generally inadmissible to prove the person's conduct on a specified occasion. (§ 1101, subd. (a); *People v. Villatoro* (2012) 54 Cal.4th 1152, 1159.) However, "[t]he Legislature has . . . created specific exceptions to the rule against admitting character evidence in cases involving sexual offenses (§ 1108, subd. (a)), and domestic violence, elder or dependent abuse, or child abuse (§ 1109, subd. (a)(1)–(3))."[12] (*People v. Villatoro*, at p. 1159.)

"[B]oth sections 1108 and 1109 limit the admissibility of evidence of prior misconduct if its probative value is substantially outweighed by its prejudicial effect. (§§ 352; 1108, subd. (a); 1109, subd. (a).) The specific retention of the power to exclude evidence under section 352, found in both sections 1108 and 1109, provides 'a realistic safeguard that ensures that the presumption of innocence and other characteristics of due process are not weakened by an unfair use of evidence of past acts.' " (*People v. Brown* (2000) 77 Cal.App.4th 1324, 1334.)

Thus, even relevant evidence of past domestic violence may be excluded when its "probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (§ 352.) " 'Evidence is substantially more prejudicial than probative . . . [citation] [only] if, broadly stated, it

---

[12] The provision at issue in this case, section 1109, subdivision (a)(1), generally provides, "in a criminal action in which the defendant is accused of an offense involving domestic violence, evidence of the defendant's commission of other domestic violence is not made inadmissible by Section 1101 if the evidence is not inadmissible pursuant to Section 352." Similarly, section 1108, subdivision (a), provides, "In a criminal action in which the defendant is accused of a sexual offense, evidence of the defendant's commission of another sexual offense or offenses is not made inadmissible by Section 1101, if the evidence is not inadmissible pursuant to Section 352."

poses an intolerable "risk to the fairness of the proceedings or the reliability of the outcome" [citation].' [Citation.] ' "The prejudice which . . . Evidence Code section 352 is designed to avoid is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence." [Citations.] "Rather, the statute uses the word in its etymological sense of 'prejudging' a person or cause on the basis of extraneous factors." ' [Citations.]" (*People v. Eubanks* (2011) 53 Cal.4th 110, 144.)

In the analogous context of evidence of a defendant's prior sex offenses governed by section 1108, our Supreme Court has explained how trial courts should evaluate such evidence under section 352: "By reason of section 1108, trial courts may no longer deem 'propensity' evidence unduly prejudicial per se, but must engage in a careful weighing process under section 352. Rather than admit or exclude every sex offense a defendant commits, trial judges must consider such factors as its nature, relevance, and possible remoteness, the degree of certainty of its commission and the likelihood of confusing, misleading, or distracting the jurors from their main inquiry, its similarity to the charged offense, its likely prejudicial impact on the jurors, the burden on the defendant in defending against the uncharged offense, and the availability of less prejudicial alternatives to its outright admission, such as admitting some but not all of the defendant's other sex offenses, or excluding irrelevant though inflammatory details surrounding the offense." (*People v. Falsetta* (1999) 21 Cal.4th 903, 916–917 (*Falsetta*).)

We review the trial court's ruling on the admissibility of evidence for abuse of discretion. (*People v. Johnson* (2010) 185 Cal.App.4th. 520, 531.)

C.    *Analysis*

Here, the trial court determined that, in light of defendant's statements to police suggesting the killing was an "an accident or an incident that arose over an argument," the "[e]vidence of prior domestic violence and a propensity to do violence to a partner or former partner is extremely relevant." After weighing the probative value against the potential prejudice, the court allowed the evidence to come in under section 1109.

18

Initially, we reject defendant's argument that the trial court was required to exclude the evidence of the prior incident of domestic violence *in its entirety*. There is no question that defendant's prior convictions for assault against his former girlfriend and her new partner qualified under section 1109 as prior incidents of domestic violence. Section 1109 permits the admission of a defendant's other acts of domestic violence for the purpose of showing a propensity to commit such crimes. (*People v. Hoover, supra,* 77 Cal.App.4th at p. 1027 ["the use of character evidence in domestic violence cases is more justified than in a murder case or a forgery case"].) As the trial court observed, the issue in this case was not who killed Gillihan, but rather "the circumstances under which" she was killed "and the intent of the defendant in committing the acts" that led to her death. In different contexts, it has been said that a defendant is not entitled to a false aura of veracity. (*People v. Humiston* (1993) 20 Cal.App.4th 460, 474–475 [defendant's testimony at suppression hearing may be used for impeachment purposes if trial testimony is inconsistent with prior testimony]; *People v. Castro* (1986) 186 Cal.App.3d 1211, 1217 [defendant's prior convictions may be admissible for purposes of impeachment].) Similarly in this case, defendant was not entitled to a false aura of veracity in respect to his claim that Gillihan's death was an accident or the result of provocation. (Cf. *People v. Cordova* (2015) 62 Cal.4th 104, 134 [prior sex offenses relevant to rebut defense theory that the defendant's sperm entered the victim's body by innocent means].) Accordingly, we see no abuse of discretion in either the trial court's finding that defendant's "propensity to do violence to a partner or former partner [was] extremely relevant," or its concomitant ruling that defendant's past conduct was admissible to some extent to show propensity to commit domestic violence.

This does not end the matter, however. The weighing process of section 352 requires the trial court to consider "the availability of less prejudicial alternatives" such as "excluding irrelevant though inflammatory details surrounding the offense." (*Falsetta, supra*, 21 Cal.4th at p. 917.) The trial court acknowledged the prior incident involved "totally different" acts, including lying in wait and the use of a knife. Defense counsel asked that the court to "sanitize" the evidence to avoid prejudice. Later, the court

19

properly determined the prior incident was admissible to show propensity to commit domestic violence under section 1109, but the facts of the prior incident were *not* admissible to show premeditation and deliberation in the current case. This was an important distinction. The court did not want the prosecutor to "dwell[] on the specifics of this earlier offense" or "delv[e] into each specific detail of this prior incident." The court further instructed the prosecutor not to argue "the lying in wait on this earlier occasion is somehow evidence of his guilt in this matter because it's not." The court's statements indicate it was well aware of the risk the jury might improperly use the domestic violence evidence to "infer" planning and premeditation in the current case.

But when the trial court finally drew the line as to what could be admitted, it allowed evidence that was at odds with its previously expressed concerns as to the prejudicial nature of the evidence. The trial court undercut its own ruling limiting the scope of the evidence by stating that the prosecutor would be able to "bring in the fact that the defendant admitted . . . that he came into the apartment when the victim was not home, waited until she and her new partner were asleep and came out and attacked them." Although the prosecutor would not be allowed to argue that lying in wait was evidence of guilt, the court's order did not preclude him from putting on evidence that defendant "waited" until the victims were asleep, and then came out and attacked them. In other words, the prosecutor could bring in the evidence of lying in wait, but not make the argument. Given the serious risk the jury would improperly use the specific facts of defendant's past conduct to find premeditation and deliberation in the current matter, it was incumbent upon the trial court to exclude evidence of defendant's extensive planning and waiting in the prior incident.[13] We thus conclude the trial court abused its discretion

---

[13] As we have explained, however, it was not an abuse of discretion to admit *some* evidence of defendant's prior domestic violence. The trial court reasonably found the prior act of domestic violence highly relevant to defendant's claims of accident, self-defense, and provocation. The evidence at trial showed that defendant was jealous and suspected Gillihan was cheating on him with Proccacio, that Gillihan did not want defendant staying in her apartment, and that Gillihan wanted to break up with defendant. In light of this evidence, it would not have been an abuse of discretion if the trial court

in allowing the prosecutor to adduce evidence that defendant entered his former girlfriend's apartment when the victims were not home, that he lay in wait for many hours (some of the time hidden in a closet), and that the attack occurred when the victims were asleep. This evidence was highly inflammatory and was not specifically relevant to the purpose for which the past incident of domestic violence was admitted, that is, to show a propensity to do violence to a partner or former partner.

The trial court's error was compounded by its ambiguous ruling on the limitations on the evidence. As we have described, the prosecutor took advantage of the ambiguity, eliciting many details of the offense from Officer Martin, almost all without objection from defense counsel. Thus, the jury learned that defendant thought about doing something to his former girlfriend and her new boyfriend the previous week and "kept going back and forth" on the idea, that he brought a knife to the apartment and used it, and that the attack left Estrella covered in blood and Cepeda's bedroom spattered with blood. It is apparent that the trial court believed the prosecutor overstepped the bounds of its evidentiary ruling. In a discussion outside the presence of the jury after Martin's testimony was concluded, the trial court chastised the prosecutor: "You know, when you were going into this testimony, I told you [you] were not to go into the details of how *long this went on, the hiding*, I mean, this—the details of the incident itself. The fact that it occurred is one thing, and you've gotten all of that in. But then you turned right around and tried to bring in the fact, you know, *he took the knife in with him*, all of this, I guess

had limited the evidence to the facts of defendant's prior act of domestic under section 1109 such as the victims Cepeda and Estrella were defendant's former girlfriend and her new partner, defendant thought they had cheated on him before Cepeda broke up with him, defendant attacked them in Cepeda's bedroom, defendant wanted to hurt them, and he thought they had betrayed him and broken his heart. (Cf. *People v. Cordova*, *supra*, 62 Cal.4th at pp. 133–134 [prior sex offenses were admissible under section 1108 where they "bore the following commonality": they were sex offenses committed late at night inside a home against young children]; *People v. Johnson*, *supra*, 185 Cal.App.4th at pp. 532–533 [acts of domestic violence that occurred more than 10 years earlier were admissible, despite contrary presumption of section 1109, subdivision (e), where "common factors" in past conduct strongly suggested the defendant had a problem with anger management when he felt rejected or challenged by an intimate partner].)

to show premeditation in that incident. . . . [Y]ou're trying to . . .show some kind of similar pattern of which the Court feels there is none. I thought I made it clear to you when you brought that up." (Italics added.) Once again, the trial court correctly recognized the great risk that the jury would misuse this evidence. Unfortunately, its ruling admitting the evidence was contradictory and less than clear.

We further conclude the trial court's error prejudiced defendant. The jury in this case had to decide whether defendant was guilty of first degree murder where the evidence of premeditation—principally, the continued use of a carotid restraint hold for 15 seconds after Gillihan's body went limp—paled in comparison to the evidence defendant previously brought a knife to his former girlfriend's apartment, hid in a closet and lay in wait for hours, and then attacked his former girlfriend and her new boyfriend in the middle of the night in their bed, leaving the new boyfriend and the bedroom covered in blood. We recognize that the jury received limited-use instructions on the prior domestic violence evidence and that the prosecutor did not argue in closing that the prior incident showed planning or premeditation in this case. But the trial was short (the witness testimony took only three days), Martin's testimony regarding the prior incident was vivid, and the evidence of premeditation and deliberation in the killing of Gillihan was underwhelming. The limited use instruction could not erase the image of defendant hiding in a closet with a knife waiting for the moment to attack his former girlfriend and her boyfriend, and a jury would not need closing argument to remember it. The evidence at trial supported, but did not compel, a finding of first degree premeditated murder. Under these circumstances, it is reasonably probable the result would have been more favorable to defendant had the jury not heard this extensive, inflammatory evidence of defendant's prior incident of domestic violence. (*People v. Partida* (2005) 37 Cal.4th 428, 439 ["state law error in admitting evidence is subject to the traditional *Watson* test"].)[14]

_____

[14] Defendant also argues the prosecutor committed misconduct by violating the court's earlier ruling, and that defense counsel was ineffective in failing to object. In

22

**III.**    *The Prosecutor's Closing Argument*

Defendant argues the prosecutor misstated the law in his closing argument. Because we have concluded the conviction for murder must be reversed, we need not address this issue.  For guidance on retrial, we make two observations.

First, for heat-of-passion voluntary manslaughter, "[t]he provocative conduct by the victim may be physical *or verbal*."  (*People v. Lee* (1999) 20 Cal.4th 47, 59, italics added.)  Thus, it would be incorrect for a prosecutor to argue that verbal conduct can *never* amount to provocation.  Second, "to reduce murder to manslaughter, provocation must be such as would 'render an ordinary person of average disposition "liable to act rashly or without due deliberation and reflection, and from this passion rather than from judgment," ' " but it need not "be such as would move an ordinary person to kill." (*People v. Trinh* (2014) 59 Cal.4th 216, 232–233.)  Thus, it would be improper to argue that the test for provocation is whether an ordinary person of average disposition would act in *the same way defendant acted in this case*.

## DISPOSITION

The judgment as to count 1 is reversed.  The remainder of the judgment is affirmed.

---

light of our holding regarding the trial court's ruling on the evidence, we need not address these arguments.

During the pendency of this appeal, defendant's appellate counsel filed a petition for habeas corpus relief in this court.  The petition is also based on trial counsel's alleged ineffectiveness on this and other grounds.  We have denied the habeas petition (A142412) by separate order filed this day.

_____
Miller, J.

We concur:

_____
Richman, Acting P.J.

_____
Stewart, J.

A137355/A139872, *People v. Disa*

24

Trial Court:  Superior Court of Solano County

Trial Judge:  Hon. Peter B. Foor

Attorneys for Defendant and Appellant
under appointments by the Court of Appeal    Jonathan Soglin
Tara Mulay

Attorneys for Plaintiff and Respondent    Kamala D. Harris
Attorney General
Dane R. Gillette
Chief Assistant Attorney General
Gerald A. Engler
Senior Assistant Attorney General
Jeffrey M. Laurence
Supervising Deputy Attorney General
Aileen Bunney
Deputy Attorney General

A137355/A139872, *People v. Disa*