Filed 12/9/25  P. v. Vargas CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E083931 |
| v. | (Super.Ct.No. FWV22004451) |
| ANGEL PADILLA VARGAS, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Ingrid Adamson Uhler Judge.  Affirmed.

Thomas Owen, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Eric A. Swenson and Tyler L. Krentz, Deputy Attorneys General, for Plaintiff and Respondent.

1

INTRODUCTION

After hearing evidence that he attacked his girlfriend with a knife, a jury convicted defendant and appellant Angel Padilla Vargas of premeditated attempted murder and making criminal threats, among other offenses. (Pen. Code, §§ 664, 187, subd. (a), 245, subd. (a)(1).)[1] On appeal, Vargas argues that: (1) the record contains insufficient evidence of premeditation and deliberation to support the attempted murder conviction, and (2) the trial court failed to provide a required unanimity instruction on the criminal threats charge. We conclude those arguments lack merit and affirm.

FACTUAL BACKGROUND

A. *Prosecution's Case*

In the late evening of December 9, 2022, Vargas attacked the victim, Jane Doe, with a knife in the presence of her two young daughters. At the time of the incident, Vargas and Doe had been dating for about three years and were renting a room together in a mobile home owned by M.H. Vargas and Doe had a three-year-old daughter, and Doe had a twelve-year-old daughter from another relationship.

The day before the attack, Vargas was riding in a car with his friend and a woman, J.M., who happened to be Vargas's neighbor. Vargas was upset. He told them that he thought Doe was cheating on him with his female landlord, M.H., and he said that he "was going to kill her." At trial, J.M. testified that she was not sure which "her" Vargas was referring to but figured his threat was directed toward the landlord.

_____

[1] Unlabeled statutory citations refer to the Penal Code.

Doe testified that Vargas was a jealous boyfriend, and he would accuse her, "daily" of being unfaithful. She told the jury that, on the night before the attack, she had suggested that they end their relationship, and Vargas had responded, " 'No, I'll kill you first.' " The following evening, Vargas returned home from work after 9:00 p.m. He was holding some beer and told Doe not to bother him. Doe went into their bedroom, where her daughters were already asleep, and Vargas followed her in, demanding that she stop ignoring him and "tell him the truth that [she] wanted to leave him because [she] already had someone else." When Doe failed to react to his accusations, he threw furniture around the room for several minutes until Doe's daughters woke up.

The older daughter asked Vargas what was going on, and Doe told him to calm down. Vargas left the bedroom through a door that led outside to a patio where they kept some cooking supplies, and when he returned, he was holding a large kitchen knife.

Vargas called Doe a "bitch" and a "whore" and said that "if [she] wasn't going to be with him, then [she] wasn't going to be with anybody" and that "he was going to kill [her]." Doe was holding her older daughter in her arms and Vargas stood about an arm's length away from them. Doe plead with him to calm down and yelled, " 'My daughter's in the middle. . . . You're going to hurt her.' " The older daughter told him to leave her mother alone, and he responded, " 'You need to move aside or I'm going to hurt you, too.' "

Vargas swung the knife at Doe several times. She was able to dodge most of his advances, but he made contact at least twice, cutting her arm and the left side of her head. The older daughter noticed the injuries and told her mother that she was bleeding.

3

Vargas turned to leave the bedroom through the patio door, and the older daughter grabbed the younger daughter and told her mother to run. Doe followed her daughters out of the bedroom and banged on the door that separated her part of the trailer from M.H.'s, yelling for the landlord to help them and let them in.

At trial, M.H. testified that she was reading in bed when she heard pounding and yelling coming from the other side of her trailer. When she heard the older daughter yell, " 'Please open the door,' " she left her bedroom and opened the outer door to her side of the home. Doe's older daughter was holding the younger daughter in her arms and shaking, and Doe was standing behind her daughters, bleeding from her head. M.H. ushered them inside, locked the outer door, and told them to lock themselves inside her bedroom and hide.

Vargas soon began banging on the other side of the outer door "with something" and broke the door's screen. Through the door, M.H. told him to calm down and that she was going to call the police. She asked him what he was doing to Doe, and he told her "not to worry about it, that he was going to kill [her] too." Afraid that the outer door would not hold, M.H. ran out of her house through a different door—a sliding glass door located on the side of the home. She found a place to hide outside, behind a neighbor's house, and called 911.

As M.H. was calling for help, Vargas broke through the outer door and began pounding on M.H.'s bedroom door. He told Doe to come out of the room or he would kill her. When she did not come out, he kicked open the door. Doe told him "to calm down, that they were going to arrest him," but he grabbed her arm and said she had to go

4

with him. He swung the knife at her several more times and made at least two attempts to stab her in the head again.

To placate Vargas, Doe said that she would go with him. As he was leading her out of the bedroom, she broke free of his grip, grabbed her daughters, and ran out of the same sliding glass door M.H. had used earlier. As she scanned her surroundings for a place to hide, she felt weak from the blood loss.

M.H. testified that, when she saw the three of them coming toward her, Doe was bleeding and saying, " 'He's going to kill us. He's going to kill us.' " As the women waited for the police to arrive, Vargas went next door to J.M.'s house. At trial, J.M. said that she was sleeping when she heard loud banging on the door. When she answered the door, Vargas was standing there, covered in blood, and he told J.M., " 'I killed her. I told you I was going to kill her.' " Vargas asked her for some clean clothes, but J.M. went back inside and refused to help him.

When the police arrived, M.H.'s mobile home had been ransacked, and the walls and doors were streaked with blood. Vargas had broken the sliding glass door, three other doors, the microwave, the stove, the refrigerator, and the television. After searching for him with the help of a helicopter, officers found Vargas crouched behind a nearby pickup truck. He tried to run from the officers and had to be tackled before he was taken into custody.

When the officers found the women, they all appeared to be in shock. Doe was taken to the hospital for medical treatment. Her face was covered in blood, and she had

two inch-long stab wounds on her head and a stab wound on her arm. The following day, M.H. found the knife Vargas had used in the attack near some trees in her front yard.

Doe testified that she believed that Vargas was going to kill her during the attack. She obtained a restraining order against him after the incident and was still terrified of him at the time of trial.

B. *Defense Case*

Vargas did not testify or call any witnesses to testify in his defense.

C. *Verdict and Sentencing*

The jury convicted Vargas of premeditated attempted murder (§§ §§ 664, 187, subd. (a)); assault with a deadly weapon (§ 245, subd. (a)(1)); making criminal threats (§ 422, subd. (a)); vandalism (§ 594, subd. (b)(1)); and two counts of child abuse (§ 273a, subd. (a)). The jury also found that, during the commission of the attempted murder, he personally used a deadly weapon. (§ 12022, subd. (b)(1).) The trial court sentenced him to three years eight months in prison, plus a consecutive term of seven years to life.

## DISCUSSION

A. *Premeditation and Deliberation*

Vargas argues that we must reverse the premeditated attempted murder conviction because the record does not contain sufficient evidence of premeditation and deliberation. We disagree.

An attempted murder is deliberate and premeditated "if it occurs ' " 'as the result of preexisting thought and reflection rather than unconsidered or rash impulse.' " ' " (*Cardenas* (2020) 53 Cal.App.5th 102, 121; *People v. Jurado* (2006) 38 Cal.4th 72, 118.)

6

Deliberation refers to a " 'careful weighing of considerations in forming a course of action,' " and premeditation means " 'thought over in advance.' " (*People v. Halvorsen* (2007) 42 Cal.4th 379, 419.)

"[T]he requisite reflection need not span a specific or extended period of time." (*People v. Nelson* (2011) 51 Cal.4th 198, 213 (*Nelson*).) The key inquiry is whether the killing " ' " 'occurred as the result of preexisting reflection rather than unconsidered or rash impulse.' " ' " (*People v. Cage* (2015) 62 Cal.4th 256, 276.) "Such reflection may be revealed by planning activity, motive, and the manner of the killings, among other things." (*People v. Potts* (2019) 6 Cal.5th 1012, 1027 (*Potts*).) Those categories of evidence—referred to as the *Anderson*[2] factors—"are descriptive and neither normative nor exhaustive," so "reviewing courts need not accord them any particular weight" (*People v. Halvorsen*, *supra*, 42 Cal.4th at p. 420).

Vargas contends that the record contains insufficient evidence of premeditation and deliberation because "[t]he more likely interpretation of the facts suggests a crime of passion or an impulsive act of violence, not a premeditated intent to kill." Vargas's challenge fails for the simple reason that he asks us to apply an incorrect standard of review.

In reviewing a sufficiency of the evidence claim, we review the record "to determine whether it discloses reasonable and credible evidence to allow a rational trier of fact to determine guilt beyond a reasonable doubt," and we "draw all reasonable

---

[2] *People v. Anderson* (1968) 70 Cal.2d 15, 26-27 (*Anderson*).

7

inferences in favor of the judgment." (*People v. Cardenas* (2020) 53 Cal.App.5th 102, 119, fn. 11 (*Cardenas*).)  We do not resolve credibility issues or evidentiary conflicts, as that is "the exclusive province of the trier of fact." (*People v. Young* (2005) 34 Cal.4th 1149, 1181.)  Instead, we uphold the conviction " 'unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction]." ' " (*People v. Cravens* (2012) 53 Cal.4th 500, 508.)  Thus, Vargas's claim that his characterization of the evidence is the "more likely interpretation" is insufficient to warrant reversal.  The jury's interpretation of the evidence does not have to be the more likely one for it to be upheld on substantial evidence review; it simply has to be supported by reasonable and credible evidence.

But more importantly, the record contains more than sufficient evidence from which the jury could conclude that Vargas's attempted murder of Doe was the result of reflection rather than impulse.  The prosecution presented evidence that, during an argument about his jealous suspicions, Vargas went outside to retrieve a knife, then subjected Doe to a prolonged knife attack that involved his chasing her through the house and telling her that he was going to kill her.  (See, e.g. *People v. Manriquez* (2005) 37 Cal.4th 547, 577 [substantial evidence of premeditation and deliberation where the defendant approached the victim several minutes after they had engaged in a verbal altercation, pulled a gun from his waistband, and shot the victim in the chest].)  Crucially, Vargas voiced his plan to kill Doe, not only during, but also before and after his attack.  From that evidence, the jury could reasonably conclude that his actions were premeditated and deliberate.

8

In arguing for reversal, Vargas's argument asks us to view the record in the light most favorable to him. For example, he contends that his multiple threats to kill Doe reflected his "emotional instability . . . rather than any calculated plan." He also argues that his attack was "chaotic and disorganized," and the fact that he "did not deliver a fatal blow, despite being armed with a weapon capable of causing death, strongly suggest[s] that the attack was impulsive . . . and not designed to kill." He also argues that he was too intoxicated to form a plan to kill Doe.

However, the inferences are different when conflicts in the evidence are resolved in favor of the verdict, as the standard of review requires. For instance, the jury could reasonably infer a deliberate design to kill from the fact that Vargas stabbed a particularly vulnerable body part, Doe's head, during his attack. (See, e.g. *People v. Anderson* (1968) 70 Cal.2d 15, 27 ["[P]lunging a lethal weapon into the chest evidences a deliberate intention to kill"].) And, although the distance from the bedroom to the patio may have been short, the jury could nevertheless conclude that the distance afforded Vargas a sufficient opportunity to form a deliberate plan to kill Doe because "[t]houghts may follow each other with great rapidity, and cold, calculated judgment may be arrived at quickly." (*Nelson*, *supra*, 51 Cal.4th at p. 213.) The jury could also reasonably infer from Vargas's threat to harm Doe's older daughter if she did not move away from Doe, and from his resumption of his attack after Doe fled to M.H.'s side of the trailer, that he was enacting a preconceived design from which he would not be deterred. (*Potts*, *supra*, 6 Cal.5th at p. 1029 ["A theory that a person killed in a fit of rage is undermined by proof

9

that, after ample opportunity for reflection, the person decided that continuing a violent attack was appropriate."].)

Additionally, Vargas's conduct before and after the killing is inconsistent with a rash, impulsive killing. The jury could reasonably infer from both of his statements to his neighbor that he was carrying out a plan he had formed at least as early as the previous day and that his motive was jealousy. (*People v. Disa* (2016) 1 Cal.App.5th 654, 667 [The jury may consider the "defendant's conduct after the killing in relation to the manner of killing."]; *People v. Brooks* (2017) 3 Cal.5th 1, 59, 66 [Evidence that the defendant had become "increasingly jealous and possessive of" the victim in the months before he killed her was evidence of motive and supported a finding of premeditation and deliberation.].) It does not matter that J.M. did not, at the time, take Vargas's threat from the day before the attack seriously. What matters is how the jury interpreted the threat. Given the evidence of Vargas's actions after the threat, the jury could reasonably conclude that the threat was in fact serious and that he intended to kill Doe.

Finally, we reject Vargas's contention that the evidence that he was intoxicated "undermined the prosecution's argument that [he] acted with premeditation and deliberation." The trial court instructed the jury that it could consider evidence of voluntary intoxication in deciding whether Vargas formed an intent to kill or acted with deliberation and premeditation. The jury resolved the factual question of Vargas's intoxication against him, and their finding is supported by substantial evidence. (See *People v. Castillo* (1997) 16 Cal.4th 1009, 1014 [The question of whether a defendant was intoxicated and the effect of the intoxication on their mental state is one of fact for

10

the jury to resolve.].) Although Doe testified that Vargas arrived home from work with "beers in his hand," she did not know how much he drank and did not describe him as drunk. From that evidence, the jury could reasonably conclude that he was not intoxicated, let alone so intoxicated as to prevent him from forming a plan to kill.

For all of these reasons, we conclude that the record contains substantial evidence to support the jury's finding of premeditation and deliberation.

## A. *Unanimity Instruction*

Vargas argues that the trial court committed prejudicial error by failing to give a unanimity instruction for the criminal threats charge because the record contains evidence that he made multiple threats to kill Doe. We disagree.

"A criminal defendant is entitled to a verdict in which all 12 jurors concur as a matter of due process under the state and federal Constitutions. [Citation.] In any case in which the evidence would permit jurors to find the defendant guilty of a crime based on two or more discrete acts, either the prosecutor must elect among the alternatives or the court must require the jury to agree on the same criminal act." (*People v. Arevalo–Iraheta* (2011) 193 Cal.App.4th 1574, 1588–1589.) "The omission of a unanimity instruction is reversible error if, without it, some jurors may have believed the defendant guilty based on one act, while others may have believed him guilty based on another." (*Id.* at p. 1589.)

There are multiple exceptions to the unanimity instruction requirement. As relevant here, the "continuous-course-of-conduct exception" applies if the separate acts that could amount to the charged offense " 'are so closely connected in time as to form

11

part of one transaction.' " (*People v. Jennings* (2010) 50 Cal.4th 616, 679.) "There also is no need for a unanimity instruction if the defendant offers the same defense or defenses to the various acts constituting the charged crime." (*Ibid.*) The rationale behind the same-defense exception is that "a guilty verdict indicates that the jury rejected the defendant's defense in toto." (*People v. Hernandez* (2013) 217 Cal.App.4th 559, 572.)

Vargas argues that a unanimity instruction was required because Doe testified about at least four different threats from Vargas, any one of which could have been the basis of the jury's guilty verdict. Specifically, he argues that Doe testified about the following threats: (1) his threat to kill her when they were arguing inside their bedroom, before he retrieved the knife; (2) his threat to kill her after he returned from the patio, while he was wielding the knife; (3) his threat to harm her older daughter if her daughter did not get out of the way; and (4) his threat to kill her after he found her inside M.H.'s bedroom. We are not persuaded.

To begin with, the record demonstrates that the prosecution elected to treat the threats he made to kill Doe while he was swinging the knife at her as the basis for the criminal threats charge. This is made clear by the charge itself, which identified Doe as the victim, and by the prosecutor's closing argument, in which he identified the offending conduct as the "multiple" threats Vargas made to kill Doe while "[h]e had the knife in his hand, and he was swinging at her in close proximity." Because of that election, there was no risk that some, but not all, of the jurors would have convicted Vargas of the offense based on the threat he made to the older daughter or the threat he made to Doe before he grabbed the knife. (See *People v. Hawkins* (2002) 98 Cal.App.4th 1428, 1455 [unanimity

12

instruction was not required where the prosecutor identified in argument to the jury "what conduct by defendant amounted to the crime charged"].)

Moreover, a unanimity instruction was not required due to the fact that the elected conduct covered multiple threats. This is because the threats Vargas made to kill Doe while wielding the knife fall under both exceptions described above. The continuous-course-of-conduct exception applied because the threats formed part of a single transaction—Vargas's knife attack on Doe. (*People v. Jennings*, *supra*, 50 Cal.4th at p. 679.) The same-defense exception applied because Vargas's defense to all of the charges except vandalism was that Doe was not a credible witness and was not telling the truth. In closing argument, defense counsel conceded Vargas's guilt on the vandalism charge but told the jury that his client never attacked or threatened to kill Doe. Counsel argued that the more reasonable interpretation of the evidence was that Vargas and Doe had argued, Doe had taken her daughters with her and left, and that Vargas had ransacked the mobile home after they had gone. By finding Vargas guilty of all the charged offenses, the jury demonstrated that it rejected his defense in full. (*People v. Hernandez*, *supra*, 217 Cal.App.4th at p. 572.)

For all of these reasons, we reject Vargas's challenge to the criminal threats conviction.

DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

FIELDS _____
J.

We concur:

RAMIREZ _____
P. J.


McKINSTER _____
J.

14