Filed 9/8/21  P. v. Mayorga CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

|  |  |
|---|---|
| THE PEOPLE, | C089086 |
| Plaintiff and Respondent, | (Super. Ct. No. 16FE022652) |
| v. | |
| MARIO MICHAEL MAYORGA, | |
| Defendant and Appellant. | |

A jury convicted defendant Mario Michael Mayorga of first degree murder (Pen. Code, § 187, subd. (a)) and found true that he personally used a deadly weapon (Pen. Code, § 12022, subd. (b)(1)) in the death of Tina Morales.  In a bench trial, the court found true that defendant had two prior serious felony convictions.  (Pen. Code, § 667, subds. (b)-(i).)  Defendant was sentenced to 76 years to life, consisting of an indeterminate term of 25 years to life for first degree murder, tripled under the three

strikes law, plus a consecutive one-year determinate term for the personal use of a deadly weapon. (Pen. Code, §§ 190, subd. (a), 667, subd. (e)(2)(A)(i), 12022, subd. (b)(1).)

On appeal, defendant asserts that the trial court abused its discretion by: (1) admitting evidence of defendant's prior acts of domestic abuse against Morales and her daughter under Evidence Code section 1109;[1] (2) admitting evidence under section 1250 of Morales's statements that she intended to leave defendant; and (3) excluding third party culpability evidence that Morales was involved in methamphetamine use and sale. Defendant further claims that the cumulative effect of these errors denied him a fair trial. Lastly, defendant contends that his conviction of first degree murder is not supported by substantial evidence.

We conclude that the trial court erred only in admitting hearsay evidence under section 1250 that Morales said she was going to leave defendant, the state of mind exception to the hearsay rule. Such evidence is admissible to show that defendant was motivated to murder Morales because she intended to leave him, but only if there is independent evidence that defendant knew of her intention. The prosecution offered no such evidence. However, the error was harmless given other inculpatory evidence.

The judgment will be affirmed.

## FACTUAL BACKGROUND

Meriah Gomez is Morales's daughter.[2] Meriah's sister Pillar Neil dated defendant for a year or two before their mother's murder in 2016.

Meriah testified that defendant and Neil were always arguing and fighting. They would hit each other. Meriah saw defendant pull Neil down by her ponytail multiple times. One time, Meriah saw defendant push Neil's face with his palm. There were

---

[1] All undesignated statutory references are to the Evidence Code.

[2] Because more than one witness with the last name Gomez testified at trial, we refer to these witnesses by their first names with no disrespect or informality intended.

2

times when Meriah saw Neil come back after an argument with defendant with her face red and bruised and bleeding as if she had bloody nose. More than once Meriah noticed that Neil had a black eye.

Neil broke up with defendant. In early 2016, Morales started dating defendant. Meriah was surprised that Morales was dating defendant. During the time Morales and defendant were dating, they were living together, moving back and forth between Los Angeles, where they stayed with defendant's sister, and Sacramento, where they stayed with Meriah or her grandmother. When Morales went to Los Angeles with defendant, they would drive. Defendant had a gold-colored SUV.

In October 2016 Morales went missing. Defendant told Meriah that he and Morales had an argument, she took off, and he couldn't find her. Meriah called to make a missing person's report. Shortly after defendant told Meriah that Morales was missing, Meriah received a call from a woman at a domestic violence shelter saying Morales was safe and coming home. She told Meriah where to pick up Morales. When Meriah picked Morales up, she noticed that Morales had bruises on her body, a large lump on the side of her head, and a black eye. Morales was crying and acting scared. Morales told Meriah that defendant and she were fighting and she jumped out of the car while it was moving because he was yelling and hitting her. Morales said defendant was punching her and pulling her hair. Morales said she ran to someone's house and hid. Morales stayed with Meriah for a few days and then at her grandmother's for a week. Meriah's grandmother told her that defendant picked up Morales and they drove back to Los Angeles.

Meriah saw Morales again in November 2016, before Thanksgiving. Morales, defendant and his mother came to Meriah's house. They left in defendant's car and when they came back, defendant and Morales were arguing. Morales said that defendant had taken her money and bank card. Morales's face was red and swollen and she was crying. She said that defendant had hit her and knocked her to the ground. Meriah told defendant and his mother to leave and they did. Morales stayed with Meriah. Morales told Meriah

3

she did not want to be with defendant anymore. Meriah took Morales to her grandmother's.

Meriah had plans to spend Thanksgiving with her mother but Morales never showed up at Meriah's house. Meriah tried to call her mother but did not get through to her. On November 25, 2016, Meriah learned from her aunt that Morales had been murdered.

Jasmine Gomez is Morales's daughter and the sister of Meriah and Neil. Jasmine testified that when Neil starting dating defendant in April 2012, Jasmine and Neil were close; they lived together. The relationship between Neil and defendant started as friendly and then got more intimate. In 2013, Jasmine noticed Neil had bruises around her eye and on her arms. Neil and defendant were having arguments, yelling back and forth. Once Neil put Jasmine's hand on the back of Neil's head so Jasmine could feel a soft indent there. Two or three times, Jasmine saw large purple bruises on Neil's ribs. In late summer 2013, Jasmine saw that Neil's lip was "busted."

In 2014, Neil and Jasmine were living together in an apartment. One time Jasmine saw defendant follow Neil into the bathroom and close the door. Jasmine heard a loud bang like something fell. Then she heard a sound like a punch. She heard muffled sounds of body movement and slapping. Jasmine ran to the door and kicked it open. Jasmine saw defendant holding Neil down by her hair and hitting her in the face with a closed fist. Defendant hit Neil three times in the face. Jasmine told defendant to leave the house. Defendant tried to talk to Jasmine in a calm manner but she was frantic. After Jasmine told defendant to leave three times, he walked out.

In December 2015, Jasmine was inside a duplex and Morales, Neil and defendant were outside. Morales came inside and said something to Jasmine and she went to the window. Jasmine saw Neil falling down and defendant standing over her with his hands out. Morales ran to the back room to call their male cousins to come over. Neil was yelling. Defendant's champagne-colored Trailblazer was in front of the house.

4

In December 2015, Morales told Jasmine that she was dating defendant. Jasmine was upset with Morales for dating defendant, who had abused Neil. Jasmine stopped speaking to Morales when she moved to Los Angeles with defendant in July 2016.

On October 1, 2016, Efren Gonzalez was fixing up the front yard of a house in Venice Beach. A woman came running up, very scared and yelling, and went into the backyard. Gonzalez went into the back yard to see what the woman was doing. She was hiding, shaking and saying that someone wanted to kill her. Before Gonzalez went in the backyard, he saw a dark-colored Trailblazer come up, driving slowly. The driver's side window was open and the driver, a man, was yelling "Tina, Tina." The car came around a second time, still driving slowly. The man was still yelling for Tina. When Gonzalez went into the backyard, the woman looked terrorized. The woman said that the man in the Trailblazer was her boyfriend. She said he wanted to kill her, that he was crazy. She said he had a gun. A neighbor called the police and they arrived. The woman was still afraid. She said she wanted to go to Sacramento. She didn't have anything with her, no phone or purse. She said she left everything in her boyfriend's car. Gonzalez gave her $20 and took her to a place where there was a lot of traffic, a lot of people, so she would feel safer, and someone told her how to get the bus.

Angelica Martinez works at Peace Over Violence doing case management for domestic violence survivors. Martinez used to work on a team that responds in the field to a sexual assault or emergency. In 2016, Martinez was working in downtown Los Angeles. On October 2, 2016, Martinez was asked by the Downtown Women's Center to go to the Los Angeles U.S.C. Hospital downtown to assist a homeless survivor who had disclosed domestic violence. Martinez met a woman in the emergency room who said her name was Tina Morales. Morales was shaking and appeared very scared. Morales had bruising around her left eye and pain in the abdomen area where she said she had been hit. Morales said the person who assaulted her was her boyfriend, but she refused to

name him.  Morales said she was afraid that if he found out she had notified law enforcement there would be consequences for her.

Morales said she had been assaulted in the Venice Beach area.  She and defendant were walking on the beach and got into argument.  Her boyfriend was drinking and the argument escalated.  They separated and she walked back to the car.  They met again when her boyfriend went to the car.  Inside the car, they argued and her boyfriend hit her.  Her boyfriend's tone of voice scared her and she jumped out.  She had none of her belongings with her.  Morales said she wanted to return to Sacramento to her daughter's.  The Downtown Women's Center and Peace Over Violence assisted Morales in getting back to Sacramento.

Juanita Santos was Morales's friend.  Santos knew Morales for nine or 10 years.  On Thanksgiving 2016, late in the evening, Morales and defendant came to Santos's apartment.  Morales looked scared.  Morales was wearing defendant's sweats.  At one point, Morales and defendant went outside.  They were arguing loudly.  Santos rapped on the window to tell them to keep it down.  Santos went outside to smoke a cigarette.  Defendant was holding a thing he said was his "turkey thermometer."  It was about two-and-a-half feet long.  It was made of silver-colored metal and it was very sharp.  It was staked into the grass.  Defendant said he was going to walk to get a bottle of liquor.  He said he was cold and wanted his sweats back.  Morales took the sweats off and gave them to defendant.  She only had leggings on.  Santos gave Morales her sweats and a bra.

When defendant left, Morales seemed more relaxed.  Morales asked if she could use the phone to call her daughters.  Morales said she wanted to get her stuff from the hotel and go; that's why she was calling her daughters.  Morales wanted to go to her daughter Meriah's house.  But her children never answered.  Morales did get through to "Bernadette."

Before defendant went to the store, he walked to a nearby intersection.  Santos and Morales heard a gunshot.  They had a conversation about Morales leaving defendant.

6

Morales said she was scared of him. Santos told Morales she had been in abusive relationship. Morales brushed Santos off saying only that Morales could calm defendant down. After an hour, defendant came back with a bottle of "MD 20/20." Bernadette arrived. Morales gave Santos a tight hug and a kiss on the cheek and said, "I'll see you later." Morales got in Bernadette's car and defendant got in the back seat.

In October 2016, Santos learned of the Venice Beach incident. She noticed bruises on the upper part of Morales's arms at the time.

Bernadette Christon is Morales's cousin. On the day before Thanksgiving in 2016, Christon went with Morales and her aunt to get turkeys and came back to Morales's mother's house. Christon knew Morales was dating defendant. Christon's relationship with defendant was good until that day. After getting the turkeys, Christon left and came back. Morales was not there. Then Morales came in crying. She said defendant had punched her in the face and taken her money.

On Thanksgiving Day, Christon got calls from a number she didn't recognize. She finally called back and Morales answered. Christon later learned it was Santos's phone number. Morales asked Christon for a ride from Santos's house to a hotel to get Morales's stuff and then go back to her mother's place. When Christon got there, Santos, Morales and defendant were outside. Morales had said to pick her up alone; she never said defendant would be there. Morales and defendant got in Christon's car; Morales in the front seat and defendant in the back. Defendant was a bit drunk and kind of belligerent. Christon gave Morales and defendant a ride to a Best Western hotel. Defendant squeezed Christon's shoulder and asked if she wanted to come up and "chill," but she said she had to go. Christon saw defendant's Trailblazer in the parking lot.

When defendant got out of the car, Christon saw "some little box-looking like a mermaid or something on it, shiny, silver" about three-and-a-half feet long. Christon testified at trial that the metal box could hold a pole but she never saw a pole. Christon confirmed that when interviewed by a police officer, she drew a picture of a pole, not a

7

rectangle. Christon described it to the officer as a "chrome kind of bar" and "shiny like a silver bar." Christon saw both Morales and defendant holding this object. Morales was the last person Christon saw holding it. She had it on her shoulder. In the car, Christon asked Morales if she still wanted to go her mother's. Christon offered to wait while Morales got her stuff. Morales declined. Christon dropped defendant and Morales off around 1:30 in the morning.

In November 2016 around Thanksgiving time, Meghan Smith was staying at a Best Western hotel. Smith had a boyfriend, Anthony Contreras, staying in the hotel room sometimes; he would come and go. On the night of Thanksgiving, November 24, Smith heard people yelling in the room next door over the noise of the television. Then she heard something slammed against the wall between the two rooms. It sounded like a body being thrown against a wall. Smith went downstairs to tell the clerk about the commotion and ask to be moved to a balcony room. She went back upstairs and passed the room next door. She saw a man standing in the doorway with the door pulled to his back and cracked open slightly. The man had an angry look on his face. Smith thought he was angry because she had complained. She went in her room and locked the door. The room next door was quiet. The next day the police woke Smith up and she made a statement about what she had seen and heard. For her safety, Smith did not want to be involved in the investigation; she knew the officers were homicide detectives.

At trial, Smith identified defendant as the man she saw in the doorway. When Smith made an initial statement to the officers, she was not truthful. She described the man as White and having long red hair and a red beard, which was the opposite of what she saw. She also told the police there was a silhouette of another person in the room. She said she thought it was a male because she had heard two males arguing earlier in the evening.

Smith told Contreras that she had lied to the homicide detectives. When Smith was contacted by a defense investigator in 2018, Smith told him she had lied and

8

identified defendant in a six-person lineup as the man who had been there. When Smith gave a statement to the defense investigator, she indicated that the red-haired man was with a female but she didn't say the female was Morales. When Smith was later contacted by a prosecution investigator, she told him what she had told the defense investigator and that she had initially lied about the identification of the man in the doorway. In an interview in the district attorney's office, Smith said she had seen the red-haired man earlier. But that day was not Thanksgiving.

Smith admitted that she told the police the room had been reserved by her mother but it was reserved by someone with whom she had sex for money. Smith told a police investigator that she thought Morales was working Back Page, an escort website, because Morales had different guys visiting her. Smith knew about the website because she had done work through Back Page. Smith testified that she told detectives she was scared, because it was easy to find someone on Back Page and she thought it would be easy to find her.

In 2016, around Thanksgiving, Contreras had broken off his relationship with Smith, but he was still seeing her often at the Best Western. Contreras visited Smith at the Best Western on Thanksgiving Day. He arrived at the hotel shortly after 3:00 a.m. Contreras went up to Smith's room and spent the night there. Police officers woke him up in the morning. Contreras did not hear any noise from the room next door during the period from when he arrived to when the police woke him. Earlier in the evening of Thanksgiving Day, at about 4:00 or 5:00 p.m., Contreras saw a light-skinned Mexican man looking out the doorway of the room next to Smith's room. The man was not defendant.

On November 25, 2016, Kushum Kaur was working as a housekeeper at the Best Western. Christina Garcia was at the front desk. Kaur and Garcia entered room 307 at about 11:30 a.m. on November 25. Kaur saw shoes and legs behind a dresser. Garcia called the manager, Joey Craft. Craft went into the room. Kaur told him that there was a

9

person lying on the ground with her back against the wall. Craft saw the body and called out but received no response. He called the police.

Craft was on the computer when Morales checked in on Thanksgiving, November 24, 2016. Craft testified that when a guest checks into a room, a new key card is made. Morales checked in by herself. Craft wrote "Chevy Trailblazer champagne" as her guest vehicle information. Craft did not recall giving Morales three key cards. He said it would be very rare to give out three keys.

After seeing the body, Craft flagged down a patrol officer. Other officers arrived and the fire department was en route. The officers followed Craft to the hotel room and saw a woman on the floor later identified as Morales. Fire department personnel arrived and declared the woman deceased. A crime scene investigator observed that Morales had trauma to her head, face, and chest and there was blood on the wall. A metal rod or stake with a pointed end was found underneath the sheets. Three Best Western key cards were in Morales's pants pocket. Defendant's Trailblazer was parked at the Best Western.

On November 26, 2016, Christon called one of the homicide investigators and came in voluntarily for an interview, which was recorded.[3] Christon identified photographs of Morales and defendant. Christon showed the investigator the route she took to pick up Morales and defendant and take them to the Best Western.

On December 1, 2016, a detective arrested defendant at a psychiatric hospital.

The police reviewed surveillance video from a Best Value Inn across from the Best Western showing Morales and defendant walking together at 6:11 p.m. on November 24. Video from a nearby Denny's shows Morales and defendant outside the door at 6:20 p.m. They were at Denny's for approximately an hour.

---

[3] A videotape of the interview was played at trial and a transcript handed out to the jury.

A forensic pathologist performed an autopsy of Morales to determine the cause of death. Morales had seven stab wounds to her face and neck. The most serious stab wound, to her left eye, was 11.5 centimeters deep, had penetrated her brain and was fatal. Morales also had four stab wounds to her chest, forearms and wrist, including wounds to the back of her left forearm and wrist. The pathologist observed contusions and abrasions to Morales's scalp, neck, breast, clavicle, chest, shoulder, hands, and legs.

A criminalist collected DNA samples from Morales and defendant. A swab from the pointy end of the metal stake included Morales's DNA and excluded defendant's. A swab seven inches from the pointy end also included Morales's DNA and excluded defendant's. Swabs from the handle were not interpretable because the criminalist was not certain of the number of contributors. The criminalist determined that her DNA had contaminated a second swab from the handle area. Swabs from the outside of a pillowcase included both defendant's and Morales's DNA and a third unknown contributor. The criminalist confirmed that the DNA of a hotel maid who had touched a pillowcase without a glove might be found on the pillowcase. Swabs from various areas of a pair of boxer briefs also included the DNA of both defendant and Morales, except that the inside of the back waistband included an unknown third party and only defendant's DNA was conclusively found inside the front of the waistband. The DNA of defendant, Morales and an unknown third person was found on the outside of a black latex glove discovered inside the pocket of a pair of shorts. A swab from the inside of the glove conclusively found only defendant's DNA.

Defendant's fingerprint was found on the license plate of the Trailblazer and on beer cans, a Gatorade bottle and an MD 20/20 bottle in the Best Western motel room where Morales was found. Defendant's and Morales's fingerprints were on the coffeemaker in the room, as well as a fingerprint that was not theirs. Only defendant's fingerprints were found on a metal towel bar, television, metal face plate of the Kleenex box, digital clock, and shower faucet. Morales's fingerprints were on an ice bucket,

11

plastic cup and beer can. Three fingerprints that could not be identified were run through California and Federal Bureau of Investigation identification systems and did not match to anyone.

Defendant did not testify.

The defense case consisted of a stipulation read to the jury that Morales had been convicted of crimes involving dishonesty and moral turpitude in 2002 and 2010.

## DISCUSSION

### *Admission of Prior Acts of Domestic Abuse*

Defendant contends that the trial court abused its discretion when it admitted evidence that he "committed uncharged prior domestic violence offenses against the decedent, Tina Morales, and her daughter, Pillar Neil."

Both parties submitted motions in limine contesting whether evidence of incidents of domestic violence by defendant against Neil in 2013 and 2014 and against Morales in October 2016 in Los Angeles and around the time of Thanksgiving was admissible under section 1109. The trial court conducted a hearing. The court found that this conduct constituted abuse and domestic violence as defined in section 1109 and related statutes. Acknowledging that similarity of the uncharged act to the charged offense is a factor affecting probative value, the court found the evidence was "probative in that it does tend to show, if the jury believes it, that [defendant] has a propensity to either commit or threaten violence against female partner and he specifically resorts to physical violence." The trial court then weighed the evidence under section 352 and concluded the "probative value far outweighs any prejudicial effect." The court reasoned: (1) the prior acts were not "particularly inflammatory" compared with the current charge; (2) the jury would not be confused by the evidence because the court would instruct the jury with CALCRIM No. 852 "that gives the jury direction in how they should view this type of evidence"; (3) "there is a heightened level of probative value" because the conduct occurred over a

12

"relatively short time span"; and (4) though several witnesses would need to be called, this would not lead to undue consumption of time.[4]

"Ordinarily, propensity evidence—evidence that a defendant committed an uncharged offense—is inadmissible to prove the defendant's disposition to commit the charged offense. (§ 1101, subd. (a).)" (*People v. Kerley* (2018) 23 Cal.App.5th 513, 531 (*Kerley*).) Section 1109 provides an exception for domestic violence: "[I]n a criminal action in which the defendant is accused of an offense involving domestic violence, evidence of the defendant's commission of other domestic violence is not made inadmissible by Section 1101 if the evidence is not inadmissible pursuant to Section 352." (§ 1109, subd. (a)(1).) Section 1109 thus "permits the admission of defendant's other acts of domestic violence for the purpose of showing a propensity to commit such crimes. [Citation.]" (*People v. Hoover* (2000) 77 Cal.App.4th 1020, 1024 (*Hoover*).)

The statute "reflects the legislative judgment that in domestic violence cases, as in sex crimes, similar prior offenses are 'uniquely probative' of guilt in a later accusation." (*People v. Johnson* (2010) 185 Cal.App.4th 520, 532.) In enacting section 1109, the Legislature observed that "[t]he propensity inference is particularly appropriate in the area of domestic violence because on-going violence and abuse is the norm in domestic violence cases. Not only is there a great likelihood that any one battering episode is part of a larger scheme of dominance and control, that scheme usually escalates in frequency

---

[4] CALCRIM No. 852A, as given in this case, instructed the jury in relevant part: "If you decide that the defendant committed the uncharged domestic violence, you may but are not required to, conclude from that evidence that the defendant was disposed or inclined to commit domestic violence, and based on that decision, also conclude that the defendant was likely to commit Penal Code Section 187(a) [first degree murder], as charged here. [¶] If you conclude that defendant committed the uncharged domestic violence that conclusion is only one factor to consider along with all the other evidence. It is not sufficient by itself to prove that the defendant is guilty of Penal Code Section 187(a). [¶] The People must still prove the charge and allegation beyond a reasonable doubt."

and severity. Without the propensity inference, the escalating nature of domestic violence is likewise masked. If we fail to address the very essence of domestic violence, we will continue to see cases where perpetrators of this violence will beat their intimate partners, even kill them, and go on to beat or kill the next intimate partner. Since criminal prosecution is one of the few factors which may interrupt the escalating pattern of domestic violence, we must be willing to look at that pattern during the criminal prosecution, or we will miss the opportunity to address this problem at all." (Assem. Com. on Public Safety, Rep. on Sen. Bill No. 1876 (1995-1996 Reg. Sess.) June 25, 1996, pp. 3-4; see also *Hoover, supra*, 77 Cal.App.4th at pp. 1027-1028; *Kerley, supra*, 23 Cal.App.5th at pp. 535-536.)

The language of the statute expressly incorporates review under section 352. " 'The specific retention of the power to exclude evidence under section 352 found in . . . [section] 1109, provides a "realistic safeguard that ensures the presumption of innocence and other characteristics of due process are not weakened by unfair use of evidence of past acts." ' [Citation.]" (*People v. Disa* (2016) 1 Cal.App.5th 654, 671 (*Disa*).)

The trial court must exercise its discretion to determine whether the probative value of evidence of uncharged acts of domestic violence is "substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (§ 352.) Undue prejudice, as used in section 352, does not mean evidence damaging to the defendant—all evidence probative of guilt is damaging to the defendant's case—but rather evidence which evokes emotional bias against the defendant and has little effect on the issues. (*People v. Fruits* (2016) 247 Cal.App.4th 188, 205; *Disa, supra*, 1 Cal.App.5th at p. 671.)

In weighing whether to admit or exclude an act of domestic violence under section 352, " 'trial judges must consider such factors as its nature, relevance, and possible remoteness, the degree of certainty of its commission and the likelihood of confusing,

14

misleading, or distracting the jurors from their main inquiry, its similarity to the charged offense, its likely prejudicial impact on the jurors, the burden on the defendant in defending against the uncharged offense, and the availability of less prejudicial alternatives to its outright admission, such as admitting some but not all of the defendant's other sex offenses, or excluding irrelevant though inflammatory details surrounding the offense.' [Citation.]" (*Disa, supra*, 1 Cal.App.5th at p. 671.)

"We review the admission of other act evidence for abuse of discretion." (*People v. Merchant* (2019) 40 Cal.App.5th 1179, 1192 (*Merchant*).)

Defendant contends "the evidence had minimal probative value because this is not a case in which the evidence about the charged crimes showed a 'larger scheme of dominance and control . . . escalat[ing] in frequency and severity' against the same victim." However, while the legislative history quoted above acknowledges that domestic violence "usually escalates in frequency and severity" (Rep. on Sen. Bill No. 1876, *supra*, at pp. 3-4), it does not suggest that section 1109 limits admission of evidence to this pattern nor does the language of the statute contain any indication to that effect. Further, defendant acknowledges "the prosecution's theory was that [defendant's] misconduct toward Morales escalated from threats to murder . . . ." Indeed, "murder is 'the ultimate form of domestic violence.' " (*People v. Brown* (2011) 192 Cal.App.4th 1222, 1237.) In the Venice Beach incident, defendant hit Morales while threatening to kill her and his change of tone so frightened her that she jumped out of a moving car, presaging the fatal escalation that eventually occurred. Moreover, contrary to defendant's suggestion that section 1109 evidence must show escalating acts of violence against the ultimate victim, evidence that defendant was physically violent towards Neil makes the evidence even more probative. (*Merchant, supra*, 40 Cal.App.5th at p. 1194 ["the fact that [defendant] engaged in domestic violence against two different women *strengthens* its probative value on propensity"].)

15

Defendant next contends "the evidence had minimal probative value because of the significant dissimilarities between the charged murder and the prior offenses." Defendant cites *People v. Hollie* (2010) 180 Cal.App.4th 1262, in which the court said " '[t]he principal factor affecting the probative value of an uncharged act is its similarity to the charged offense.' " (*Id.* at p. 1274.) Again, section 1109 does not condition admission of prior uncharged acts of domestic violence on similarity to the charged offense. Evidence is probative even when it involves different victims or different acts of domestic violence. Section 1109 only requires that both the charged and uncharged offenses be acts of domestic violence. What the California Supreme Court said in *People v. Jones* (2012) 54 Cal.4th 1, regarding evidence of prior sex offenses admitted under section 1108 applies to section 1109, admission of propensity evidence does not require that the offenses "be similar; it is enough the charged offense and the prior crimes" are "offenses as defined by the statute." (*Jones, supra*, at p. 50.) Courts have upheld admission of prior acts of domestic violence under section 1109 as evidence of propensity to commit first degree murder, including acts of the same nature as the trial court allowed in this case. (*People v. Johnson* (2000) 77 Cal.App.4th 410, 415 [admitting propensity evidence that the defendant slapped his wife, pulled a gun on her, pulled her hair, punched her in the face and the stomach]; *People v. Escobar* (2000) 82 Cal.App.4th 1085, 1092, 1096-1097 [admitting propensity evidence that the defendant had punched his wife in the face].)

Finally, defendant argues that the evidence "was bound to cause undue prejudice that outweighed its minimal probative value." As discussed above, we conclude that the evidence had more than minimal probative value. However, defendant draws a distinction between the prior acts evidenced by eyewitness testimony or Morales's statements to witnesses and the "charged murder [which] could not be proved by eyewitness testimony or statements by the decedent," arguing prejudice because the evidence of prior acts was stronger than evidence of the charged offense. By this,

defendant means that evidence that he committed the murder was circumstantial while the evidence that he committed the prior offenses was direct. We find no prejudice resulting from this supposed imbalance because prior offenses are not direct evidence that defendant committed the charged crime. "Though prior offenses are usually established by direct evidence, a prior offense is itself circumstantial evidence relevant to the charged offense." (*People v. James* (2000) 81 Cal.App.4th 1343, 1359, fn. 9, citing *People v. Falsetta* (1999) 21 Cal.4th 903, 920.) Moreover, as the jury was instructed: "Both direct and circumstantial evidence are acceptable types of evidence to prove or disprove the elements of the charge . . . neither is necessarily more reliable than the other. Neither is entitled to any greater weight than the other." (CALCRIM No. 223; see *James, supra*, at p. 1359, fn. 9.) An appellate court presumes that jurors applied the instructions given them. (*People v. Adcox* (1988) 47 Cal.3d 207, 253.)

We conclude that the evidence of defendant's prior acts of domestic violence in this case was not made inadmissible by section 352.

*Admission of Morales's Statements That She Intended to Leave Defendant*

Over defense objections, the trial court admitted the testimony of Santos and Christon that Morales made statements on Thanksgiving Day in 2016 indicating she wanted to leave defendant. Defense counsel objected but the court also allowed Meriah's testimony that two days before Thanksgiving Morales said, "She didn't want to be with him anymore."

Defendant contends "the trial court abused its discretion when it admitted Morales's statement about her intention. Although the statements were admitted to prove Morales's state of mind rather than the truth of her assertions, the statements were inadmissible hearsay because her state of mind was not relevant."

At a hearing, the trial court considered admission of Christon's testimony that Morales said she wanted a ride to the Best Western to pack her belongings and leave defendant. The prosecution argued Morales's statement was relevant to show her state of

17

mind, i.e., that she intended to leave defendant, which provided a motive for him to kill her. The court found the statement to Christon admissible under section 1250 as bearing on Morales's state of mind.

However, the trial court also observed that *People v. Riccardi* (2012) 54 Cal.4th 758 (*Riccardi*), disapproved on another ground in *People v. Rangel* (2016) 62 Cal.4th 1192, 1216, required independent evidence that defendant knew of Morales's intention to leave him in order to admit the statement to prove defendant's motive. The court directed counsel to look at the case for purposes of further discussion, observing that "it doesn't appear anyway that there is that foundational fact to allow it to be introduced for its truth for purposes of showing his motive." Nonetheless, the court found the statement "admissible for other reasons under [section] 1250," without stating what those reasons were. The parties have not directed us to any subsequent discussion of *Riccardi* in the record.

"[S]ection 1250, which authorizes the admission of out-of-court statements to prove the declarant's state of mind, permits the admission of such evidence only if the declarant's state of mind 'is itself an issue in the action' or if the evidence 'is offered to prove or explain acts or conduct of the declarant.' " (*Riccardi, supra*, 54 Cal.4th at pp. 814-815, quoting § 1250, subd. (a)(1)-(2).) The California Supreme Court concluded in *Riccardi* that "evidence of the decedent's state of mind, offered under . . . section 1250, can be relevant to a defendant's motive—but only if there is independent, admissible evidence that the defendant was aware of the decedent's state of mind before the crime and may have been motivated by it." (*Riccardi, supra*, at p. 820.)

The Attorney General argues that "Morales's state of mind was relevant to the prosecution's theory that [defendant] got angry that she wanted to leave him," and therefore admissible under section 1250. However, there is no independent evidence in the record indicating that defendant was aware of Morales's desire to separate from him. In fact, as defendant points out in his reply brief, the Attorney General cites *Riccardi*

18

without mentioning the limitation on the admissibility of state of mind evidence established by that case. Accordingly, we conclude that it was error for the trial court to allow this evidence to be presented to the jury because Morales's state of mind was not an issue in the case. (*People v. Noguera* (1992) 4 Cal.4th 599, 622 (*Noguera*); *People v. Ruiz* (1988) 44 Cal.3d 589, 609.)

Although the trial court erred, the admission of Morales's hearsay statements that she wanted to leave defendant does not require reversal. (*Noguera, supra*, 4 Cal.4th at p. 622.) The evidence that defendant murdered Morales though circumstantial was strong. In the October 2016 incident in Venice Beach, defendant beat Morales and threatened to kill her. She was so frightened she jumped out of a moving car leaving her phone and other belongings behind. Two days before she was murdered, Morales told Meriah in front of defendant and his mother that defendant had hit her, knocked her to the ground, and taken her money and her bank card, with the result that Meriah ordered defendant and his mother to leave her house. On the night of the murder, defendant displayed the murder weapon to Santos and referred to it as his "turkey thermometer," i.e., a pointed object inserted into meat. After lying to the police about a man with red hair and a red beard being outside Morales's hotel room to avoid involvement in a murder investigation, Smith identified defendant as the man she saw. Christon saw defendant's Trailblazer at the motel when she dropped off Morales and defendant; it was still there when police arrived the next day, but defendant was gone.

Additionally, in closing, the prosecutor made only a fleeting reference to Christon's testimony that Morales said she wanted a ride to pick up her stuff and go to her mother's, and did not mention Meriah's or Santos's testimony that Morales said she wanted to leave defendant. The testimony of all of these witnesses was brief, as well.

Thus, the trial court's error in allowing the hearsay statements did not add significantly to the substantial evidence pointing to defendant's culpability. (*Noguera, supra*, 4 Cal.4th at p. 623.) For these same reasons, we reject defendant's claim that

19

admission of Morales's hearsay statements was prejudicial error either under the standard of *People v. Watson* (1956) 46 Cal.2d 818, 836 (a reasonable probability of a more favorable result absent the error) or *Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705] (harmless beyond a reasonable doubt), or violated his constitutional rights. (*Noguera, supra*, at p. 623.)

*Third Party Culpability*

Defendant contends that the trial court erred in excluding third party culpability evidence offered "to prove that the decedent had a long history of involvement in illicit methamphetamine sales, for the purpose of suggesting that the killer was someone involved in the illicit drug trade . . . ."

The prosecution moved in limine to exclude evidence of third party culpability. In opposition, defendant argued that evidence would show that Morales had been involved in methamphetamine dealing her entire life and charges for possessing methamphetamine for sale were pending at the time of her death. Defendant contended this evidence was not third party culpability evidence but relevant to show that others had access and opportunity to murder Morales, raising a reasonable doubt as to defendant's guilt.

At a hearing on the motion, the court said "I'm just focused on what the relevance, probative value is of these prior convictions and/or her pending case. [¶] That's what I'm not -- I'm not connecting it to third party-culpability at this point." After further argument, defense counsel said he was "comfortable with the Court reserving a ruling until the evidence comes out and we can revisit it."

Towards the end of the trial, the court conducted another hearing on the introduction of evidence of Morales's involvement in drug sales that led to convictions in 1997 and 2002, as well as a pending drug charge. The court noted the defense's offer of proof was that "this evidence would establish that someone involved in the drug trade was involved in the homicide."

20

After further argument, the trial court found that "a lot of what we are talking about really is third-party culpability." The court stated the standard for admission of third party culpability evidence is that "it doesn't have to show substantial proof of probability that a third person committed the act" and "need only be capable of raising a reasonable doubt of a defendant's guilt." But "evidence of mere motive or opportunity to commit the crime in another person without more will not suffice to raise a reasonable doubt about a defendant's guilt. There has to be some direct or circumstantial evidence linking a third person to [the] actual perpetration of the crime." The court concluded "I don't find that Ms. Morales's prior drug sales in 1997 and 2002 or 19 and 14 years prior to the homicide to be relevant or probative on this issue that's being raised. [¶] There is no direct or circumstantial evidence linking a third person to the commission of this homicide that is somehow connected to drug sales in general or Ms. Morales's prior convictions or even related to the pending drug sale in 2016 when she passed away."

The court continued: "And to admit this evidence of drug sales essentially would turn this into a mini trial. And we then would have to -- especially on the 2016 events where she is not convicted and not only on the facts of that case but also we would have to hear evidence of the dangers, I suppose, of the drug trade . . . to even get to this potential argument that that's what caused her death here."

The trial court correctly articulated the relevant standard. "In order for evidence suggesting third party culpability to be relevant, and thus admissible, the evidence 'need not show "substantial proof of a probability" that the third person committed the act; it need only be capable of raising a reasonable doubt of defendant's guilt.' " (*People v. Ghobrial* (2018) 5 Cal.5th 250, 282-283 (*Ghobrial*), quoting *People v. Hall* (1986) 41 Cal.3d 826, 833 (*Hall*).) "Moreover, 'evidence of mere motive or opportunity to commit the crime in another person, without more, will not suffice to raise a reasonable doubt about a defendant's guilt: there must be direct or circumstantial evidence linking the third person to the actual perpetration of the crime.' [Citation.] Without this link,

21

such evidence is irrelevant and cannot be admitted. [Citation.]" (*Ghobrial, supra*, at p. 283.)

"Under . . . section 352, the trial court may also exercise its discretion to exclude evidence if 'its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or misleading the jury.' " (*Ghobrial, supra*, 5 Cal.5th at p. 283.)

We review the trial court's ruling excluding third party culpability evidence as irrelevant for abuse of discretion. (*Ghobrial, supra*, 5 Cal.5th at p. 283.)

Defendant argues that his " 'wrong man' " defense was "based on the evidence that showed that a third party had been in the hotel room rented by Tina Morales where the fatal stabbing occurred, which included the observations of a different person by Smith and Contreras, the three card keys found in Morales's possession, and the fingerprints and DNA of one or more unidentified third parties. [Citations.] But as a result of the court's exclusion of defense evidence, the defense was unable to argue that Morales's lifelong history of involvement in narcotics sales raised a reasonable doubt as to whether Morales may have been killed by someone in the illicit drug trade rather than by [defendant]."

The evidence defendant sought to introduce lacked every connection that would render it relevant as evidence of third party culpability. Neither Smith nor Contreras testified to anything connecting any individual to the perpetration of Morales's homicide. Smith provided a credible explanation why she originally lied to the police and described a man with red hair and red beard that was the opposite of what she saw (i.e., she did not want to identify the perpetrator of a homicide because she would be easy to find on an escort website). Leaving aside Smith's recantation, she and Contreras did not even see the same person. The DNA evidence that defendant relies on did not match to any known person. Moreover, there was no evidence connecting the individuals that Smith

22

and Contreras saw with drug trafficking, let alone drug trafficking that posed a risk of danger to Morales. Thus, there was no way to connect any person to Morales's murder as a result of involvement in drug trafficking.

The logic defendant seems to apply is that violence and violent people are associated with the illicit drug trade, Morales was involved in this trade and there was evidence a third party was present on the night of the murder, therefore, some unknown person she associated with in the drug trade might have known her location, had access to her and reason to kill her. This speculation regarding motive and opportunity is insufficient for admission as third party culpability evidence.

In fact, this is only evidence of a *possible* or *potential* motive. In *People v. Edelbacher* (1989) 47 Cal.3d 983, defense counsel sought to present evidence that the murder victim had asked a coworker where she could buy marijuana and that the victim's mother had expressed concern that the victim was associating with a biker gang. (*Id.* at p. 1017.) Defense counsel argued that " 'people who are dealing in narcotics frequently end up injured or shot.' " (*Id.* at pp. 1017-1018.) The court held that "defendant's proposed evidence did not identify a possible suspect other than defendant or link any third person to the commission of the crime. The evidence did not even establish an actual motive but only a possible or potential motive for [the victim's] murder. As we stated in *Hall* . . . evidence of a third party's motive, without more, is inadmissible. A fortiori, evidence showing only a third party's possible motive is not capable of raising a reasonable doubt of a defendant's guilt and is thus inadmissible." (*Id.* at p. 1018; see also *Ghobrial, supra*, 5 Cal.5th at p. 284 ["evidence showing only a third party's possible opportunity is inadmissible"]; *People v. Gutierrez* (2002) 28 Cal.4th 1083, 1137.)

Defendant argues that "the evidence was admissible pursuant to the constitutional guarantees of a defendant's due process right to present a defense. [Defendant's] federal constitutional rights compelled the admission of the third party culpability evidence, even if the evidence might have been otherwise inadmissible under state law." It is well

23

established that exclusion of evidence of third party culpability through the application of ordinary rules of evidence does not violate the constitutional right to present a defense. (*Hall, supra*, 41 Cal.3d at pp. 834-835; *People v. Prince* (2007) 40 Cal.4th 1179, 1243; *Ghobrial, supra*, 5 Cal.5th at p. 283.)

*Cumulative Error*

Defendant contends that his conviction should be reversed "due to the cumulative prejudicial effect of the evidentiary errors" at his trial, which denied him the constitutional right to due process. Since we have identified only one error, which we concluded was harmless, "[t]here is thus no cumulative error." (*People v. Leonard* (2007) 40 Cal.4th 1370, 1415; *People v. Lewis* (2001) 25 Cal.4th 610, 635.)

*Premeditation and Deliberation*

Defendant contends his conviction for first degree murder violated his constitutional due process because there was "insufficient evidence to prove premeditation and deliberation, insofar as there is no evidence that he planned the killing, had a strong preexisting motive to kill Morales, or deliberated over the manner of killing."

In closing argument, the prosecutor mentioned the incident where defendant punched Neil but was calm when he talked to Jasmine immediately afterwards, while she was frantically ordering him to leave: "[H]e flips like that and all of sudden he's calm like nothing happened." "[T]hat's the kind of man we're dealing with, all right?"

In the main, the prosecutor's focus was on the injuries, the stabbing wounds, multiple wounds to Morales's face and neck, including a deep wound to the left eye, and wounds to her arms and wrist consistent with defensive wounds. The prosecutor argued, "Think about when you're plunging something into flesh, hitting bone, hitting brain matter, you have to plunge it in, take it out 11 times. So when you're talking about premeditation and deliberation, a cold calculated judgment when you're reflecting upon what you're doing, you have 10, 11 times when you are making a choice." The

24

prosecutor concluded that "[w]hen you look at all of these injuries, there is only one degree that you can come back with and, clearly, he used a deadly weapon."

Defense counsel argued: "When they get to the motel, [defendant] squeezes Ms. Christon's shoulder and says, do you want to come up? You wanna come up and chill? Does that sound like the actions of somebody who's getting ready to kill somebody?"

When a defendant challenges the sufficiency of the evidence to support a criminal conviction, "we review the whole record to determine whether *any* rational trier of fact could have found the essential elements of the crime or special circumstances beyond a reasonable doubt. [Citation.] The record must disclose substantial evidence to support the verdict—i.e., evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] In applying this test, we review the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence. [Citation.] 'Conflicts and even testimony [that] is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends. [Citation.] We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence. [Citation.]' [Citation.]" (*People v. Zamudio* (2008) 43 Cal.4th 327, 357 (*Zamudio*); *People v. Salazar* (2016) 63 Cal.4th 214, 242 (*Salazar*); *People v. Penunuri* (2018) 5 Cal.5th 126, 142.)

The same standard of review applies when the prosecution primarily relies on circumstantial evidence. (*Salazar, supra*, 63 Cal.4th at p. 242.) " ' "If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also be reasonably reconciled with a contrary finding does not warrant a reversal of the judgment." ' " (*People v. Bean* (1988) 46 Cal.3d 919, 933; see *People v. Jones* (2013) 57 Cal.4th 899, 961.) "Although a jury must acquit if it finds the

25

evidence susceptible of a reasonable interpretation favoring innocence, it is the jury rather than the reviewing court that weighs the evidence, resolves conflicting inferences and determines whether the People have established guilt beyond a reasonable doubt. [Citation.]" (*People v. Yeoman* (2003) 31 Cal.4th 93, 128.)

"A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support" ' the jury's verdict. [Citation.]" (*Zamudio, supra*, 43 Cal.4th at p. 357.)

" 'A verdict of deliberate and premeditated first degree murder requires more than a showing of intent to kill. [Citation.] "Deliberation" refers to careful weighing of considerations in forming a course of action; "premeditation" means thought over in advance. [Citations.] "The process of premeditation . . . does not require any extended period of time. 'The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly . . . .' [Citations.]" ' [Citation.]" (*People v. Halvorsen* (2007) 42 Cal.4th 379, 419.) "To prove the killing was 'deliberate and premeditated,' it is not necessary to prove the defendant maturely and meaningfully reflected upon the gravity of the defendant's act." (Pen. Code, § 189, subd. (d).)

In reviewing the sufficiency of the evidence of premeditation and deliberation, courts typically consider the so-called *Anderson* factors: planning, motive, and manner of killing. (*People v. Williams* (2018) 23 Cal.App.5th 396, 409 (*Williams*), citing *People v. Anderson* (1968) 70 Cal.2d 15, 26-27; *People v. Shamblin* (2015) 236 Cal.App.4th 1, 10.) However, *Anderson* "did not change the definition of murder or establish elements that had to be proven in each case; it established 'guidelines to aid reviewing courts in analyzing the sufficiency of the evidence to sustain findings of premeditation and deliberation.' [Citation.] 'The *Anderson* factors, while helpful for purposes of review, are not a sine qua non to finding first degree premeditated murder, nor are they exclusive.' [Citations.] Or as we have phrased it before, the factors do not impose a

26

'straitjacket on the manner in which premeditation can be proven adequately at trial.' " (*Williams, supra*, 23 Cal.App.5th at pp. 410-411, quoting *People v. Gunder* (2007) 151 Cal.App.4th 412, 420.)

Defendant argues that "[n]othing about [defendant's] activity prior to the killing suggests that he was making plans to kill Morales." Defendant cites his invitation to Christon to come up to the hotel room to "chill," that both he and Morales carried the metal stake and he made no effort to conceal the weapon. However, defendant's reference to the stake as his "turkey thermometer," a metal object inserted into the meat of a turkey on Thanksgiving, suggests that he thought of using the stake to stab on Thanksgiving, the day of the murder. When defendant displayed the stake and Morales carried it, others including Morales may not have comprehended the implication of his words. The jury could understand defendant's invitation to Christon to indicate that he was in no hurry to complete his plan to kill Morales or that defendant had not fully made up his mind to kill Morales yet and that he reached that decision in the course of the night, either of which scenario indicates premeditation and deliberation.

Defendant acknowledges that "a plan may be 'rapidly and coldly formed' [citation] . . . ." But, defendant argues, since he brought the stake to the hotel room, he "did not need to make a calculated and considered decision" to retrieve the stake from another room to stab Morales. This argument does not explain why defendant brought a metal stake several feet long into a hotel room instead of leaving it in his Trailblazer parked outside, unless he considered using the stake as a weapon in the room.

Defendant contends his "prior violent and threatening behavior toward Morales establishes that he had trouble controlling his anger toward her," but "does not suggest a motive to kill sufficient to prove premeditation and deliberation." Defendant relies on *People v. Boatman* (2013) 221 Cal.App.4th 1253 (*Boatman*), where the court found insufficient evidence of premeditation and deliberation that the defendant and the victim had a " '[l]oud screaming argument' " and the victim sent text messages to a friend that

27

they were fighting shortly before defendant shot her.  (*Id.* at pp. 1258, 1261, 1267-1268.)

The court observed that this "*Anderson* factor refers not merely to a motive to kill, but to the kind of motive that 'would in turn support an inference that the killing was the result of a "pre-existing reflection" and "careful thought and weighing of considerations" *rather than* "mere unconsidered or rash impulse hastily executed." ' [Citation.]"  (*Id.* at p. 1268.)  The text messages and the evidence of a loud screaming argument did not suggest "this kind of motive," but rather a motive based on an  " ' "unconsidered or rash impulse hastily executed." ' "  (*Ibid.*)

As in *Williams*, we find no factual similarity between *Boatman* and the case before us.  (*Williams, supra*, 23 Cal.App.5th at pp. 411-412.)  *Boatman* did not involve a history of domestic violence by the defendant against the victim, including a threat to kill.  The crime in *Boatman* was a single shot to the face.  (*Boatman, supra*, 221 Cal.App.4th at p. 1268.)  Here, the victim was stabbed 11 times, seven times in her face and neck, including a fatal thrust 11.5 centimeters deep into her eye, and sustained defensive wounds to her arms and wrist.  Moreover, in *Boatman*, the "[d]efendant's behavior following the shooting is of someone horrified and distraught about what he had done, not someone who had just fulfilled a preconceived plan.  Immediately after the fatal shot, defendant tried to resuscitate [the victim] and directed his brother to 'call the cops.' Defendant could be heard crying in the background during the 911 call."  (*Id.* at p. 1267.)  Here, there was no evidence suggesting defendant did anything to help the victim.  (*Williams, supra*, at p. 412.)  She was found lying on the floor behind a dresser.

The manner of killing also supports an inference of deliberation by the jury.  Based on the time required to stab Morales 11 times and the severe nature of the wounds—most of them to her face and neck, including the fatal thrust into her eye—as well as contusions all over her body, the jury could infer that defendant made a deliberate decision to make sure that Morales died from her wounds.  (*Williams, supra*, 23 Cal.App.5th at p. 410 [citing as evidence of "deliberate manner of killing:  two neck

28

stabs, with an implied interval to reflect, as well as the infliction of blunt force trauma in different areas of the victim's body"]; *People v. Elliot* (2005) 37 Cal.4th 453, 471 ["The jury could have construed the repeated slashing of [the victim's] throat, in connection with the dozens of other wounds, as intimating a preconceived design to kill"]; *People v. Hovey* (1988) 44 Cal.3d 543, 556 [repeated stabbing and beating victim in the head supported " 'the inference of a calculated design to ensure death, rather than an unconsidered "explosion" of violence' "].)  Even if one stabbing motion was a spontaneous reaction, repeatedly plunging a weapon thereafter indicated a considered decision to kill.  (See *People v. Lewis* (2009) 46 Cal.4th 1255, 1293.)

Defendant argues that "[a]nger, panic, and lack of experience in using a metal stake as a stabbing implement are equally plausible explanations for such injuries" and "the lack of evidence that the injuries were inflicted over a period of time, rather than in a single frenzied attack, prevents any rational factfinder from concluding that the killer had opportunity to consider the consequences of his actions."  We disagree.  While the jury could have inferred that the stabbings reflected "a single frenzied attack," it was entitled to reject this scenario.  (*Williams, supra*, 23 Cal.App.5th at p. 411 [ "The jury *could* have reasonably found that the victim's injuries reflected an emotional, berserk attack, as suggested by defendant's briefing.  But it was permitted to find otherwise"].)

Accordingly, we conclude there was substantial evidence to support defendant's conviction of first degree murder.

## DISPOSITION

The judgment is affirmed.

                                          /s/
                                   RAYE, P. J.

We concur:

    /s/
HOCH, J.

    /s/
RENNER, J.