Filed 1/22/24  P. v. Hilliard CA1/2
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>BRANDON LEO HILLIARD,<br><br>    Defendant and Appellant. | A163651<br><br>(Contra Costa County<br>Super. Ct. No. 4-200980-1) |

A jury convicted defendant Brandon Leo Hilliard of attempted voluntary manslaughter and assault with a semiautomatic firearm and found he personally inflicted great bodily injury.  On appeal, defendant raises claims of evidentiary error and insufficiency of the evidence and seeks remand for resentencing under the amended sentencing law.  We will remand for resentencing and otherwise affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

Shortly after 11:00 a.m. on January 9, 2021, residents on Central Avenue in Pittsburg heard gunshots and called 911.  Police responded to the scene and found Walter R. lying on the ground and screaming in pain; a pool of blood collected under his buttocks and thighs.  Walter had sustained three through-and-through gunshot wounds, two on his right thigh and one on his upper left thigh.  He was taken to a hospital by ambulance.

1

Defendant was charged with attempted murder (Pen. Code, §§ 187, subd. (a), 664; count 1), assault with a semiautomatic firearm (*id.*, § 245, subd. (b); count 2), and attempted escape and escape from home confinement (*id.*, § 4532, subd. (b); count 3). As to count 1 (attempted murder), it was alleged defendant personally discharged a firearm causing great bodily injury (*id.*, § 12022.53, subd. (d)) and committed the offense while released from custody (*id.*, § 12022.1). As to count 2 (assault with a firearm), it was alleged defendant personally used a firearm (*id.*, § 12022.5, subd. (a)), personally inflicted great bodily injury (*id.*, § 12022.7, subd. (a)), and committed the offense while released from custody (*id.*, § 12022.1).

Before trial, defendant pleaded no contest to count 3 (escape) and admitted, conditionally for counts 1 and 2, the enhancement allegation that he committed the offenses while released from custody. The case then went to trial.

*Prosecution's Case*

A Central Avenue resident's external video camera recorded the incident, and the recording was played for the jury. The recording, which had no sound, was taken from the roof line of the resident's two-story house and captured the resident's front lawn, the sidewalk, street, and a few homes across the street. Defendant can be seen driving up in a silver sedan and parking behind a truck that is parked directly in front of the resident's house. He walked westbound on the street (and out of view), and returned to his car about five minutes later. Defendant was still sitting in his car when Walter appeared from the right of the frame at around 11:06 a.m., walking in the street eastbound. Walter walked up to the driver's side of defendant's car, appeared to speak with defendant very briefly, and then turned and walked back in the direction he came from. Within a few seconds of walking away,

2

Walter stopped, turned around, and headed back toward defendant (seemingly due to something defendant said) as defendant simultaneously got out of his car. Walter walked up to defendant, who had moved toward the middle of the street. They stood facing each other and had what looked like a brief verbal confrontation. At one point, defendant appeared to lean into or chest bump Walter and subsequently, Walter appeared to lean into defendant. Defendant can be seen backing away from Walter, so that he was a few feet from him. A police officer who viewed the recording testified that he observed puffs of smoke that looked like a "firearm being discharged and the gunpowder being emitted from the barrel." Walter turned and appeared to try to run away toward the west, but he fell to the ground at the front of defendant's car. About 11:07 a.m., defendant got in his car, backed up, and made a U-turn.

Four bullet casings were found at the scene of the shooting. A specialist in the firearms unit of the Sheriff's crime lab testified all four casings likely came from the same firearm, and the markings on the casings were consistent with having been fired from a Glock 43.

Around 11:00 p.m. on January 10, 2021 (the day after the shooting), San Pablo police apprehended defendant in a traffic stop. A detective testified that he analyzed a cell phone found in defendant's car and found messages sent from the phone by a user identifying himself as "Little Brandon" and "Little Hilliard." In a message sent the day after the shooting, the sender, identifying himself as Brandon, wrote he had something for sale and attached a photograph of a firearm that appeared to be a Glock 43 semiautomatic pistol; later the same day, the sender sent a message that the firearm was gone.

3

The prosecution did not call the victim Walter to testify, nor did any eyewitness identify defendant as the shooter.

*Defense*

Defendant testified on his own behalf. He grew up in Pittsburg down the block from where the shooting occurred. He lost his brother and two friends to gun violence in Pittsburg, and he himself had been shot on three separate occasions.

Defendant admitted he was placed on house arrest and was required to wear an ankle monitor in October 2020 because he committed a crime. Defendant could not leave his house, and he felt "terrible" because he was not able to see his friends or loved ones and "was just at home all by [him]self."

In January 2021, defendant cut the ankle monitor off.[1] He testified he removed the monitor because he was in a "stressful moment in [his] life" and "losing people, not being able to see friends or family or go to events, just kind of got overwhelming."

On the morning of the shooting, defendant was going to see the family of a cousin who had died from an overdose. He turned onto Central Avenue on his way to the cousin's house and passed the home of the Pease family. Defendant had played with the Pease children when he was young. As defendant drove by, Kevin Pease flagged him down, and defendant made a U-turn and parked.

Defendant testified he used to be friends with Walter. As he walked to the Peases' house, defendant saw Walter cleaning his car, which was parked west of the house. Defendant saw "a butt of a firearm on the seat" of the car, but he was not concerned "because," he testified, "I thought we were friends."

---

[1] Defendant testified he was charged with escape and had admitted the charge to the court. (This is count 3, to which defendant entered a no contest plea before trial started.)

4

Defendant and Kevin went to Kevin's room, and Walter joined them. Walter seemed relaxed and friendly. Kevin left the room and when he returned, he said his mother did not want them there, so defendant left and Walter went back to his car.

Defendant got in his car and started to leave when Kevin waved him down again. Kevin said, "just stay . . . we'll go smoke," and said he would tell Walter to leave.[2] At this point, defendant was not concerned; he was "just chillin."

Next, defendant saw Walter walk toward him and "it look[ed] like he was holding something in his waist," which "led [defendant] to believe that he had a firearm on . . . him." Walter asked for a cigarette and grabbed defendant by the shoulder and "trie[d] to pull [his] shirt, . . . through the window." Defendant pulled back and said, "No, I'm trying to leave." Walter said, " 'Go ahead and leave. I'ma light your shit up.' " Defendant understood this to mean "he's going to shoot me." Walter started to walk away, but defendant was still worried he might shoot him. As Walter reached the truck that was parked in front of defendant's car, he spun around and faced defendant. Defendant did not feel safe to back up and drive away because he thought Walter could shoot him.

When Walter first started to walk away, defendant retrieved his gun. He testified, "[B]y the time that [Walter] reached the truck [that was parked in front of defendant's car], I had unlocked my . . . glovebox to grab my firearm, but it took me a minute because I had the glovebox locked with the firearm in it, so by that time, I got out and he was already in front of my face." Defendant noticed Walter's hands were still on his waistline.

_____

[2] In the neighbor's videorecording, a young man can be seen getting into the front passenger's side of defendant's car at around 11:03 a.m. He got out of the car and jogged to the west a short time later.

Defendant walked toward Walter holding his firearm "openly" pointed to the ground. Defendant did not point his gun at Walter, "Because I didn't want it to be a gun fight. I wanted to go home." Walter started to walk away again and then said, " 'What you want to do, you bitch ass mother fucker.' " Defendant thought his life was in danger. Walter did something with his hands that, to defendant, "[s]eemed like he was going to draw [a] gun on me." Defendant testified Walter "didn't look like a person that was backing down; it looked like he wanted to hurt me." As Walter walked away the second time, he "body-checked" defendant, meaning he pushed into defendant with his shoulder and elbow. Defendant never saw Walter holding a gun, but he "just had a feeling that he had a firearm on him" "[b]ecause any person that would come towards a guy with a gun obviously has to be armed."

Defendant explained how and why he shot Walter: "So he got me past my door, and I just felt that he's—I felt like he was going to pull a pistol on me and shoot, and he kept coming towards me so I cocked back my firearm and shot three shots at him, not his head, not his body, not his waist, but his legs." Defendant kept shooting after Walter turned and started to move away from him because he "wanted to disable him so I knew he couldn't shoot me."

When he could see that Walter "was screaming in pain," defendant no longer thought he was a threat, and got in his car and left. Defendant never shot anyone before, and he did not call 911 because he was scared. He sold the gun the next day. When he was arrested, defendant did not say he shot Walter in self-defense; he testified he did not tell the police he acted in self-defense because he was scared.

In cross-examination, defendant agreed that after he got out of his car and showed Walter his gun, Walter told him to drop it and fight him like a man. When defendant refused, Walter called him a "bitch."

6

The defense also presented evidence of Walter's prior conduct to show he had a violent character. The defense called a woman who lived in Pittsburg in 2009. She testified that, on October 31, 2009, she heard knocking at the front door, and when she went to see who it was, Walter and another man shot her five times through the screen door. She testified she was scared to identify Walter as the man who shot her at that time. In cross-examination, the woman acknowledged she told a detective in 2009 that she did not see who shot her. A Pittsburg police officer testified he responded to the scene of the shooting and found the woman with multiple gunshot wounds to her back, chest, neck, and leg. The case was closed "due to lack of investigative leads."

*Prosecution's Rebuttal*

In response to the defense evidence of Walter's violent character, the prosecution called a police officer to present evidence of defendant's prior violent conduct. The officer testified he responded to an incident at a gas station on the afternoon of October 2, 2020. Surveillance footage of the incident was played for the jury. The videorecording showed the interior of the gas station store near the counter and front door. Defendant appeared to accost a customer while holding a firearm in his right hand. The item in his hand turned out to be a BB gun.

*Verdict and Sentence*

The jury found defendant not guilty of attempted murder (count 1) but found him guilty of the lesser included offense of attempted manslaughter (Pen. Code §§ 192, subd. (a)), 664) and found him guilty of assault with a semiautomatic firearm (*id.*, § 245, subd. (b); count 2). As to both counts, the jury found true the enhancement allegation of personal use of a firearm (*id.*,

7

§ 12022.5, subd. (a)), and as to count 2, it found defendant personally inflicted great bodily injury (*id.*, § 12022.7, subd. (a)).

Defendant was sentenced to 15 years, eight months in prison. The trial court designated count 2 the principal term and imposed 15 years consisting of the middle term of six years for the offense, four years (the middle term) for the firearm enhancement, three years for the great bodily injury enhancement, and two years for the on-bail enhancement. The court imposed a consecutive eight months (one-third the middle term) for count 3 (escape). As to count 1, the court imposed and stayed, pursuant to Penal Code section 654, a 15-year-term consisting of the middle term of three years for the offense, the upper term of 10 years for the firearm enhancement, and two years for the on-bail enhancement.

## DISCUSSION

A. *Exclusion of Evidence of the Victim's Prior Convictions*

Defendant contends the trial court erred as a matter of law in refusing to allow the defense to present evidence of two of Walter's prior convictions— one for being a felon in possession of a firearm in 2012 and another for residential burglary in 2013—for the purpose of showing Walter had a character for violence. We disagree.

1. <u>Applicable Law and Standard of Review</u>

Generally, character evidence is inadmissible to prove a person's conduct on a specific occasion. (Evid. Code,[3] § 1101, subd. (a); *People v. Fuiava* (2012) 53 Cal.4th 622, 695.) The Legislature has created exceptions to the rule against character evidence; one exception is "the violent victim rule." (*People v. DelRio* (2020) 54 Cal.App.5th 47, 54 (*DelRio*), citing § 1103,

---

[3] Further undesignated statutory references are to the Evidence Code.

8

subd. (a)(1).)  "This rule allows a defendant . . . to try to prove the conduct of a victim . . . conformed to his character.  Specifically, this exception allows what is usually forbidden: It permits [a defendant claiming to have acted in self-defense] to introduce evidence [the victim] had a propensity for violent aggression.  This evidence would aid [the defendant]'s effort to prove that, at the crime scene, [the victim] was violently aggressive, which forced [the defendant] to resort to deadly self-defense."  (*Ibid*.)

Section 1103, subdivision (a)(1) (§ 1103(a)(1)) provides, "In a criminal action, evidence of the character or a trait of character (in the form of an opinion, evidence of reputation, or evidence of specific instances of conduct) of the victim of the crime for which the defendant is being prosecuted is not made inadmissible by Section 1101 if the evidence is . . . [¶] . . . [o]ffered by the defendant to prove conduct of the victim in conformity with the character or trait of character."

When a defendant offers evidence of the victim's violent character under section 1103(a)(1), the prosecution is permitted to respond with evidence of the defendant's violent character.  (§ 1103, subd. (b).)[4]

"We review a trial court's exclusion of evidence for abuse of discretion." (*People v. Gutierrez* (2009) 45 Cal.4th 789, 827 [finding no abuse of discretion where the trial court excluded evidence of the victim's misdemeanor battery conviction offered to show the victim's propensity for violence under section

---

[4] Section 1103, subdivision (b), provides, "evidence of the defendant's character for violence or trait of character for violence (in the form of an opinion, evidence of reputation, or evidence of specific instances of conduct) is not made inadmissible by Section 1101 if the evidence is offered by the prosecution to prove conduct of the defendant in conformity with the character or trait of character and is offered after evidence that the victim had a character for violence or a trait of character tending to show violence has been adduced by the defendant under paragraph (1) of subdivision (a)."

9

1103(a)(1)].)  "Of course, the trial court may exclude otherwise admissible evidence pursuant to Evidence Code section 352 if admitting the evidence would have confused the issues at trial, unduly consumed time, or been more prejudicial than probative," and "[t]he trial court must always perform its gate keeping function pursuant to Evidence Code section 350 to exclude evidence that is irrelevant."  (*Id.* at pp. 827–828.)

" '[W]e review the ruling, not the court's reasoning, and, if the ruling was correct on any ground, we affirm.' "  (*People v. Chism* (2014) 58 Cal.4th 1266, 1295, fn. 12.)

2.    Procedural Background

Defendant's motions in limine included a request to introduce evidence of three crimes committed by Walter "as evidence of the alleged victim's character for dangerousness and for gun possession under Evidence Code, section 1103(a)(1)" and "as evidence of moral turpitude" for impeachment purposes.  The crimes were described as (1) "2009 felon in possession, detailed in Concord PD report No., 09-26034," (2) "2012 shooting and gun possession, detailed in Antioch PD report No., 12-11995,"[5] and (3) "2013 residential burglary, detailed in Antioch PD report No., 13-6328."  At an initial hearing on the motions in limine, defense counsel stated he also

---

[5] Although the 2012 incident was described as a "shooting and gun possession" in defendant's motion in limine and the trial court and defense counsel referred to the 2012 "shooting and gun possession" incident in an early hearing on motions in limine, later in the trial, defense counsel stated, "The gravamen of this incident is the gun possession itself," and in this appeal, defendant challenges the trial court's exclusion of evidence of a felon-in-possession conviction.  Defendant does not claim Walter has a 2012 conviction for a "shooting" (that is, an offense that includes as an element discharge of a firearm).

10

wanted to introduce evidence of a fourth incident, "an attempted murder arrest" of Walter in Pittsburg in 2009.[6]

The trial court observed the defense was offering the evidence of Walter's prior conduct for three distinct purposes, (1) evidence of moral turpitude, (2) "character for gun possession," and (3) character for violence, each of which required "a different analysis."

For the first purpose of evidence of moral turpitude, the trial court eventually ruled defense counsel could impeach Walter with the 2012 felon-in-possession conviction and 2013 residential burglary conviction because those offenses involved moral turpitude. But the court excluded reference to the 2009 felon-in-possession conviction, finding the conviction was remote in time and had no probative value, and the court excluded the 2009 attempted murder incident under Evidence Code section 352 because it "would involve the presentation of up to three witnesses on a mini trial of a 12-year-old incident."

For the second purpose of evidence of character for gun possession, the court explained, "I don't think there's a character trait, per se, for possessing a firearm," and it found possessing a firearm "11 or 12 years ago" was not "probative that you are doing so in the case in question." The court therefore ruled the defense could not argue or offer evidence to show Walter had a propensity to possess guns.

For the third purpose of character for violence, the prosecutor argued the incidents of gun possession in 2012 and residential burglary in 2013 "would be improper under Evidence Code Section 1103" because they did not involve Walter "being violent." Defense counsel told the court that Walter

---

[6] The incident underlying the arrest was the shooting on October 31, 2009, which the victim and a Pittsburg police officer testified about.

11

was "holding a gun" during the 2013 burglary, which was "threatening conduct." And, as to the "2012 incident," defense counsel argued it was "not merely the fact" of the gun possession, it was "the particular conduct during this gun possession." He described the 2012 incident as one in which Walter "enters this Ramada Inn holding his waistband in such a way that . . . not even seeing the gun, just seeing the way he is holding his waistband, just his body language, [the front desk clerk] is terrified enough to [run away] from the lobby and hide in the back room."

The trial court ruled the defense could question Walter about the 2009 attempted murder incident, the 2012 "*shooting* and gun possession" incident (italics added), and the 2013 residential burglary ("given that [defense counsel has] represented that he was armed at the time") "for the purpose of establishing . . . [Walter's] violent character, [but] not for a habit for gun possession, per se."

However, the trial court ruled that, while the convictions could be used for impeachment purposes, the convictions alone would not be sufficient to show violent character. The trial court ruled that as to Walter's violent acts underlying the 2012 and 2013 convictions, "to prove the character evidence of propensity for violence on the complaining witness, you're going to need to have witnesses under subpoena who actually observed the violent acts." The court also ruled that if the defense put on evidence of the victim's violent character, the prosecution would then be allowed to introduce evidence tending to show *defendant's* violent character.

As the trial progressed, in a later discussion of evidentiary issues, defense counsel told the court he intended to use Walter's 2012 felon-in-possession conviction and 2013 residential burglary conviction to impeach credibility only. The defense did *not* intend to use evidence of Walter's prior

12

conduct to show violent character because that would open the door for evidence of defendant's character for violence.

At the close of the prosecution's case-in-chief, the prosecutor stated that Walter would not testify after all. The prosecutor moved to redact a paramedic's report to remove Walter's response to the paramedic's question about his level of pain. The trial court granted the motion to redact, noting this meant "there are no statements of [Walter] in evidence for their truth." As a result, the defense could not present evidence of Walter's convictions for crimes of moral turpitude for impeachment purposes because there were no statements to impeach.

Defense counsel informed the court he did not intend to call any witnesses. The trial court then held a brief conference on jury instructions, after which it ruled instructions on self-defense and imperfect self-defense were not warranted "on this record."[7] Defense counsel responded that the court's rulings "completely change our calculation and strategy in the case" and said, "I'm now seeking to introduce all of our 1103 evidence as well as [defendant] will testify in this case."

After defendant testified, defense counsel asked the trial court to take judicial notice of the 2012 felon-in-possession conviction and the 2013

---

[7] Defense counsel argued the evidence of self-defense "is all in that video." The trial court disagreed, stating there was no evidence of defendant's "thinking at the time" and "absolutely no evidence of [Walter] producing a weapon, a firearm, something that might prompt or justify a deadly response by shooting him three or four times in his legs." The court further noted that the video was "quite clear that the suspect is away from [Walter] at the time," and Walter was "not charging at the suspect" or "throwing a punch or a kick" and "[i]n fact, he never does throughout the entire interaction." Nor did the video "on its face" show Walter make "threatening furtive motions that would justify being shot on the scene."

13

"residential burglary with firearm which is a violent felony" "for evidence of dangerousness."

As to the 2012 conviction, the trial court stated it had never ruled that being a felon in possession of a gun, by itself, could be admitted to show character for violence. Defense counsel argued that "being a felon in possession of a firearm that is typically used to commit crimes, showing a readiness to do evil, . . . is itself powerful evidence of dangerousness." The trial court disagreed, explaining, "the act of possessing a firearm in violation of the law because you are a convicted felon does not on its own establish a tendency or a character trait to initiate violence against other folks [any more] than any other moral-turpitude type crimes." Accordingly, the court denied the request to take judicial notice of the 2012 conviction.

The trial court also denied the defense request to admit the 2013 residential burglary conviction as evidence of a character for violence. The court reminded defense counsel that it had ruled the "testimony about those specific acts [of violence]" were required to show violent character, "not the mere conviction." The court further stated that section 1103 "doesn't seem to authorize the mere conviction to come in. It does speak in terms of opinion evidence, reputation evidence, and proof of specific violent conduct evidence or specific conduct evidence . . . ."

3.    Analysis

Defendant contends the trial court erred as a matter of law because it believed convictions are not admissible evidence under section 1103(a)(1). He argues both the 2012 felon-in-possession conviction and 2013 residential burglary conviction were admissible as "evidence of prior dangerousness,"[8]

---

[8] Although defendant repeatedly uses the term "dangerousness," as the Attorney General points out, the character or trait at issue when a defendant claims he acted in self-defense is a character for *violence*.

14

relying on *People v. Koontz* (2002) 27 Cal.4th 1041, 1084 (*Koontz*).  But *Koontz* does not support defendant's claim.

First, *Koontz* does not stand for the proposition that a conviction is admissible evidence of character for violence under section 1103.  In *Koontz*, after the defendant "testified regarding [the victim]'s character for violence, the trial court ruled that the prosecutor could present, in rebuttal, as evidence of [the] defendant's character for violence, proof of defendant's 1983 armed robbery conviction." (*Koontz, supra*, 27 Cal.4th at p. 1084.)  The court noted that the "[d]efendant *did not object* to that ruling at trial and *does not now assert it was erroneous*." (*Ibid.*, italics added.)  The defendant's appellate claim was that the prosecutor engaged in misconduct by citing the armed robbery conviction as evidence of the defendant's character for violence, contrary to section 1101's general rule against character evidence to prove conduct on a specific occasion. (*Id*. at p. 1082.)  The California Supreme Court rejected the claim because "the prosecutor's argument found support in the evidence and the trial court's ruling." (*Id*. at p. 1084.)  But our high court had no occasion to decide whether section 1103 authorizes the use of convictions as evidence of character for violence because the defendant did not challenge the trial court's ruling.  "As is well established, a case is authority only for a proposition actually considered and decided therein." (*In re Chavez* (2003) 30 Cal.4th 643, 656.)

Second, even assuming a conviction for "armed robbery" may be admissible to show violent character, that does not mean the trial court in this case was required as a matter of law to admit Walter's different convictions as evidence of violent character.  As the court in *DelRio* explained, section 1103(a)(1) allows a defendant claiming self-defense to offer evidence of the victim's "propensity for violent aggression" to support an

15

inference the victim was violently aggressive at the crime scene, bolstering the defendant's claim that he was justified in using deadly self-defense. (*DelRio*, *supra*, 54 Cal.App.5th at p. 54.) But Walter's convictions for being a felon in possession of a firearm and residential burglary do not, by themselves, support a reasonable inference that he has a propensity for violent aggression.

A character trait may be shown with "evidence of specific instances of conduct." (§ 1103(a)(1).)[9] Neither of the convictions defendant asked the trial court to take judicial notice of, however, demonstrates an instance of Walter acting with violent aggression. At most, each conviction proves Walter committed the least adjudicated elements of the offense of conviction. But—unlike the armed robbery used to show violent character in *Koontz*—Walter's offenses of felon-in-possession and residential burglary do not include an element of using force or fear, and they do not include an element of using a weapon upon a victim.[10]

In these circumstances, it was not an abuse of discretion to deny defendant's request to take judicial notice of Walter's convictions because the

---

[9] Evidence of a character trait may also be in the form of "an opinion" or "evidence of reputation." (§ 1103(a)(1).) A conviction, of course, is neither of these.

[10] In an early hearing on motions in limine, defense counsel asserted Walter "plead[ed] to carrying a gun during the course of a residential burglary and is seen by a witness entering the yard where the gun is found." But entering a dwelling house with the intent to steal is not an instance of violent aggression if the house is empty and no violence is used. Moreover, a conviction by itself would not have shown underlying conduct (such as entering a yard where a gun is later found), and nothing suggests Walter's 2013 conviction for residential burglary included a firearm enhancement. Indeed, we note the record contains no evidence of any of Walter's criminal convictions.

16

convictions, standing alone, did not support an inference of violent character. Because we find no abuse of discretion, we need not consider defendant's arguments regarding prejudice.

B.    *Sufficiency of the Evidence*

Defendant next challenges the attempted voluntary manslaughter conviction as unsupported by substantial evidence. Specifically, defendant argues the record lacks sufficient evidence of intent to kill.

1.    <u>Applicable Law and Standard of Review</u>

We start by noting that the jury's verdict of attempted voluntary manslaughter (a lesser offense of attempted murder) means it found defendant intentionally attempted to kill Walter, but he acted in either a heat of passion or imperfect self-defense. (See *People v. Rios* (2000) 23 Cal.4th 450, 460–461 [mitigating circumstances of acting in a sudden quarrel or unreasonable self-defense "reduce an intentional, unlawful killing from murder to voluntary manslaughter"].) Thus, the jury found defendant harbored the mens rea for attempted murder. (See *People v. Montes* (2003) 112 Cal.App.4th 1543, 1549–1550 [attempted voluntary manslaughter requires the same specific intent as attempted murder].)

"Attempted murder requires the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing." (*People v. Superior Court (Decker)* (2007) 41 Cal.4th 1, 7.) There is no implied malice in attempted murder. (*People v. Bland* (2002) 28 Cal.4th 313, 327–328.) Hence, to establish an attempted murder, the prosecution must prove the defendant acted with the specific intent to kill the victim. (*People v. Smith* (2005) 37 Cal.4th 733, 739 (*Smith*).)

To be guilty of attempted murder, a defendant must "harbor express malice toward that victim." (*Smith, supra*, 37 Cal.4th at p. 739.) "Express

17

malice requires a showing that the assailant either desires the victim's death or knows to a substantial certainty that the victim's death will occur." (*People v. Covarrubias* (2016) 1 Cal.5th 838, 890.)

"[I]t is well settled that intent to kill or express malice, the mental state required to convict a defendant of attempted murder, may in many cases be inferred from the defendant's acts and the circumstances of the crime. [Citation.] 'There is rarely direct evidence of a defendant's intent. Such intent must usually be derived from all the circumstances of the attempt, including the defendant's actions. [Citation.] The act of firing toward a victim at a close, but not point blank, range "in a manner that could have inflicted a mortal wound had the bullet been on target is sufficient to support an inference of intent to kill. . . ." ' " (*Smith, supra*, 37 Cal.4th at p. 741.)

" '[I]f the jury found defendant's use of a lethal weapon with lethal force was purposeful, an intent to kill could be inferred, *even if the act was done without advance consideration and only to eliminate a momentary obstacle or annoyance.*' " (*Smith, supra*, 37 Cal.4th at p. 741.) That the victim survives due to the shooter's poor marksmanship does not necessarily show lack of intent to kill; further, evidence that the shooter " ' "abandoned his efforts out of necessity or fear does not compel the conclusion that he lacked the animus to kill in the first instance." ' " (*Ibid*.)

"In reviewing a sufficiency of evidence claim, the reviewing court's role is a limited one. ' "The proper test for determining a claim of insufficiency of evidence in a criminal case is whether, on the entire record, a rational trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.] On appeal, we must view the evidence in the light most favorable to the

People and must presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. . . . " ' . . . .

" ' "Although we must ensure the evidence is reasonable, credible, and of solid value, nonetheless it is the exclusive province of the . . . jury to determine the credibility of a witness and the truth or falsity of the facts on which that determination depends. [Citation.] Thus, if the verdict is supported by substantial evidence, we must accord due deference to the trier of fact and not substitute our evaluation of a witness's credibility for that of the fact finder." ' " (*Smith*, *supra*, 37 Cal.4th at pp. 738–739.)

2. <u>Analysis</u>

Defendant argues there is no substantial evidence that he intended to kill Walter because he "did not shoot at a vital area of [Walter]'s body" and he testified that he deliberately aimed at Walter's legs to disable him. But the jury was free to disbelieve defendant's testimony about where he was aiming and what his intentions were when he shot Walter. (See *People v. Disa* (2016) 1 Cal.App.5th 654, 668 ["the jury was free to disbelieve defendant's self-serving statements regarding what [the victim] did right before he killed her"].)

Evidence showed defendant fired at Walter four times, and defendant admitted he continued shooting even after Walter turned to try to get away from him. This was sufficient evidence for a rational trier of fact to find defendant intended to kill Walter. As our high court has explained, a trier of fact may infer intent to kill from the purposeful use of a lethal weapon even if the defendant shoots " 'without advance consideration.' " (*Smith*, *supra*, 37 Cal.4th at p. 741, italics omitted.) Walter was a few feet from defendant and was not standing still when defendant shot him. On this record, the fact that defendant's shots hit Walter's upper thigh and thigh does not necessarily

19

preclude an inference of intent to kill.  (See *ibid*.)  The jury's verdict was supported by substantial evidence.

C.     *Remand for Resentencing*

Defendant was sentenced in 2021.  Effective January 1, 2022, however, the determinate sentencing law, Penal Code section 1170, was amended in several fundamental ways.  Among other things, the law now specifies the lower term is the presumptive term if either certain types of trauma or the defendant's youth contributed to the commission of the offense.  (*Id*., § 1170, subd. (b)(6).)  Defendant was 24 years old at the time of the offenses.  Defendant further suggests he has experienced psychological, physical, or childhood trauma that may have been a contributing factor in the commission of the crimes.

The parties agree the new sentencing law applies retroactively to defendant's case, as do we.  (See *People v. Flores* (2022) 73 Cal.App.5th 1032, 1039 [amendments to Penal Code section 1170 are "an ameliorative change in the law applicable to all nonfinal convictions on appeal"].)  Accordingly, we remand the matter for the trial court to resentence defendant under the current version of Penal Code section 1170.  (See *Flores* at pp. 1034–1035.)

**DISPOSITION**

The sentence is vacated and the matter is remanded to the trial court to sentence defendant under Penal Code section 1170 as amended.  The judgment is otherwise affirmed.

20

_____
Miller, J.

WE CONCUR:


_____
Stewart, P.J.


_____
Richman, J.


A163651, *People v. Hilliard*